Jack L. PICKENS, Plaintiff in error,

v.

STATE of Wisconsin, Defendant in error.

Supreme Court

*No. 77–437–CR. Argued May 7, 1980.—Decided June 3, 1980.*
(Also reported in 292 N.W.2d 601.)

550

For the plaintiff in error there was a brief and oral argument by *Frederic E. Hatch* of Monona. There were also briefs by *Howard B. Eisenberg,* state public defender.

For the defendant in error the cause was argued by *Marguerite M. Moeller,* assistant attorney general, with whom on the briefs was *Bronson C. La Follette,* attorney general.

BEILFUSS, C.J. The plaintiff in error, Jack L. Pickens, hereinafter defendant, was convicted, after a jury trial, of rape contrary to sec. 944.01, Stats. 1973, and sentenced to an indeterminate term of not more than ten years in the Wisconsin State Prison. His conviction followed an unsuccessful attempt to conduct his own defense without the aid of an attorney.

Writs of error were thereafter obtained from this court to review the judgment of conviction and the order denying defendant's postconviction motions.

The state public defender was originally appointed to represent the defendant on appeal. Briefs were filed on the defendant's behalf raising two issues:

1. Did the defendant effectively waive his right to counsel?

2. Did the trial court err in refusing to honor the defendant's withdrawal of his waiver of counsel on the second day of trial?

Subsequent to the filing of these briefs, the defendant sought to discharge the state public defender. This court granted the public defender's request to be excused from further representation of the defendant and allowed the defendant to retain private appellate counsel at his own

expense. A further request by the public defender that he be allowed to withdraw his briefs submitted on behalf of the defendant was denied.

Defendant's new appellate counsel was granted leave to file a supplemental brief. Therein he raises eight additional issues:

1. Was the question of venue properly determined at trial?

2. Did the trial court conduct an adequate inquiry to determine whether the defendant was competent to defend himself?

3. Did the trial court fail to adequately inquire into the circumstances surrounding the defendant's in-custody statement to the police?

4. Did the trial court admit polygraph evidence without a proper stipulation?

5. Did the trial court err in preventing the defendant from presenting his own polygraph evidence?

6. Was the defendant denied due process as a result of the "circus" atmosphere surrounding the conduct of his trial?

7. Was the defendant prevented from presenting his defense, and therefore denied due process, by the trial court's mechanical application of the rules of evidence?

8. Was a fraud perpetrated upon the trial court by a principal state witness?

We hold against the defendant on all ten issues raised and affirm the conviction.

Defendant's conviction rested primarily upon the testimony of Cynthia Galley, the victim of the offense. She testified that she was introduced to the defendant on the evening of July 2, 1974, by a man with whom she had worked at a local cocktail bar and restaurant. The defendant took her to his farm in the country where they had several drinks together. However, when the defendant began making sexual advances toward her, she asked to be taken home. Then, according to her testi-

mony, as the defendant was driving her home in his pickup truck in the early morning hours of July 3, 1974, he began slapping and yelling at her. He stopped his truck along a rural road, and forced her to have sexual intercourse with him, telling her he would bash her face in with a bottle if she refused. After he had completed the act, the defendant drove her home and left. Ms. Galley testified that she immediately called her estranged husband and asked him to call the police.

A physician from Lake Geneva who examined Ms. Galley later that day testified that, when he saw her, she was emotionally upset and had been crying. She complained of soreness in the vaginal area and a pelvic examination revealed mild and minimal contusions around the vagina and vulva. No spermatozoa were found in the vagina, but the physician testified that this was consistent with Ms. Galley's testimony that the defendant had withdrawn prior to climax and ejaculated on her leg.

A psychiatrist from Central State Hospital who had examined the defendant to determine his competency to stand trial testified that the defendant told him his only physical contact with Ms. Galley on the day in question was that he kissed her good-bye.

The tape and written transcript of another statement made by the defendant to a Walworth county deputy sheriff was also admitted. Although neither the tape nor transcript of this statement appear in the record on appeal, the defendant states in his brief that it contains his denial that he had sexual intercourse with Ms. Galley, but an admission to "mutual sexual contact short of intercourse."

Lastly, the state called two polygraphers from the state crime laboratory who had administered polygraph examinations to the defendant and Ms. Galley. The polygrapher who examined Ms. Galley testified that in his opinion she was truthful in her statement that the de-

fendant had forced her to have sexual intercourse with him by threatening her with a bottle. The other expert testified that the test administered to the defendant resulted in inconclusive findings.

The defendant cross-examined the state's witnesses in great detail, often going over the same area repeatedly. He also called eleven witnesses on his own behalf, although he elicited little relevant testimony from them. Several testified that the bottle with which Ms. Galley testified she had been threatened was on the kitchen table the next morning in the defendant's farmhouse, and one defense witness claimed he had heard Ms. Galley state subsequent to the alleged incident that she had not been raped by the defendant.

Much of the testimony the defendant sought to elicit was from people who lived or had lived with him on his farm. It appears that these people regarded the defendant as a kind of guru or instructor. They had little, if any, knowledge of the actual events in question and on a number of occasions their testimony was substantially curtailed by the trial court.

The trial lasted a total of five days. The jury returned a verdict of guilty and the trial court entered judgment on the verdict.

The most significant issues raised by the defendant on this appeal involve the constitutional right to counsel in criminal cases. Although he elected at trial to conduct his own defense, defendant now claims that his conviction must be overturned because the trial court failed to conduct an adequate inquiry to determine whether his waiver of counsel was knowing and voluntary and whether he was competent to conduct his own defense. For this reason, defendant contends, no effective waiver of his right to counsel could have occurred. He also argues that, even if his waiver was effective, the trial court erred in failing to honor his withdrawal of that waiver on the second day of trial.

■ The right to counsel has been recognized as one of the most important elements of constitutional due process. In *Powell v. Alabama,* 287 U.S. 45, 68–69 (1932), the United States Supreme Court described the fundamental character of this right as follows:

". . . The right to be heard would be, in many cases, of little avail if it did not comprehend the right to be heard by counsel. Even the intelligent and educated layman has small and sometimes no skill in the science of law. If charged with crime, he is incapable, generally, of determining for himself whether the indictment is good or bad. He is unfamiliar with the rules of evidence. Left without the aid of counsel he may be put on trial without a proper charge, and convicted upon incompetent evidence, or evidence irrelevant to the issue or otherwise inadmissible. He lacks both the skill and knowledge adequately to prepare his defense, even though he have a perfect one. He requires the guiding hand of counsel at every step in the proceedings against him. Without it, though he be not guilty, he faces the danger of conviction because he does not know how to establish his innocence. . . ."

Because of this fundamental character, it has long been held that a knowing and intelligent waiver of the right to counsel is an essential prerequisite to a defendant's proceeding alone once that right has attached. *Johnson v. Zerbst,* 304 U.S. 458, 464 (1938). So important is the right to attorney representation in a criminal proceeding that nonwaiver is presumed and waiver must be affirmatively shown to be knowing and voluntary in order for it to be valid. *Von Moltke v. Gillies,* 332 U.S. 708, 724 (1948) ; *Keller v. State,* 75 Wis.2d 502, 508–509, 249 N.W.2d 773 (1977).

■ At the same time, however, as this court held in *Dietz v. State,* 149 Wis. 462, 479, 136 N.W. 166 (1912), and as the United States Supreme Court has more recently made

clear in *Faretta v. California,* 422 U.S. 806 (1975), the trial court must also be cognizant and respectful of the defendant's right to conduct his own defense without the benefit of an attorney. In *Faretta* the court recognized the right to self-representation as having constitutional dimensions, just as the right to representation by counsel. Accordingly, it reversed the conviction of a defendant whose request to proceed *pro se* was improperly denied by the trial court. *See* also, *Browne v. State,* 24 Wis.2d 491, 509–511b, 129 N.W.2d 175, 131 N.W.2d 169 (1964).

The effect of this court's holding in *Dietz* and the United States Supreme Court's holding in *Faretta v. California, supra,* when considered in conjunction with the right to counsel cases, is to create somewhat of a dilemma for the trial judge who is confronted with the unusual defendant who desires to conduct his own defense. On the one hand, he is required to insure that the defendant's waiver of his right to counsel is made knowingly and voluntarily, and unless the record adequately supports such a finding, any resulting conviction is subject to reversal. On the other hand, the trial judge's conclusion that the defendant does not sufficiently understand his case to make a knowing waiver, or is not competent to conduct his own defense, necessarily prevents a defendant from exercising his right of self-representation and may bring reversal on that ground. Whichever way the trial judge decides, his decision is subject to challenge.

This is precisely the situation the trial court faced here where, shortly after trial began, the defendant informed the court that he wished to discharge his privately retained attorney and proceed *pro se.*

In fact, this was the defendant's second attempt at conducting his own defense. His first trial had terminated in a mistrial shortly after the jury was selected when

doubts were raised as to the defendant's physical and mental capacity to stand trial.

Although counsel had originally been appointed for the defendant as early as July 15, 1974, on January 7, 1975, two weeks before his trial was scheduled to begin, the defendant informed his court-appointed attorney that he no longer desired his representation and had decided to retain another attorney. The trial court allowed the attorney to withdraw with the understanding that the defendant would immediately retain other representation and trial would proceed as scheduled. However, when the defendant appeared at the pretrial conference still without representation, the trial was postponed indefinitely to allow him an opportunity to retain counsel. Finally, after the defendant continued to appear without an attorney, stating only that he was in the process of retaining one, the trial court appointed a second attorney to represent the defendant and firmly fixed March 17, 1975, as the date for trial.

Several weeks prior to that date, the defendant's second attorney asked to be relieved of the assignment citing an inability to communicate with his client and an already heavy caseload. The defendant joined in his attorney's request and explained, "He just isn't competent to hear some of my urgent matters even though I have structured them well, intellectually presented them well."

Reluctantly, the trial court granted the request but warned the defendant that his trial would still proceed at the scheduled time whether or not he had retained counsel. The defendant insisted he would retain an attorney by that time and be ready to proceed. When the date arrived and the defendant appeared without counsel, the trial court ordered him to proceed *pro se*.

However, the matter was adjourned for the day immediately after the jury was selected when the defendant began to complain of a pain in his side, supposedly

caused by injuries he had received in an automobile accident the day before. The following day an attorney from Chicago appeared on behalf of the defendant and explained that he had been retained only four days earlier. He had informed the defendant that, due to other obligations, he would not be able to appear with him on the scheduled trial date. In addition, he was not licensed to practice law in Wisconsin. The defendant nevertheless had decided to retain him.

When the defendant's newly retained attorney appeared in court on the morning after the jury had been selected, he stated that he had doubts as to both the defendant's mental and physical capacity to stand trial at that time. He also questioned the propriety of the court's having forced the defendant to proceed alone through the jury selection process. For these reasons he suggested that the trial be terminated and a new trial date set to allow the defendant to undergo physical and psychological examinations and to allow him an opportunity to prepare a defense and obtain local counsel.

The trial court concurred in defense counsel's doubts as to the defendant's competency to stand trial and, on that basis, declared a mistrial *sua sponte*. The defendant was ordered transported to Central State Hospital to undergo a psychiatric evaluation to determine his competency to stand trial.

The psychiatric evaluation revealed that the defendant suffered from no mental disease or defect and was competent to stand trial. He was returned to Walworth county and obtained a fourth attorney to undertake his defense.

Defendant's new attorney filed various pretrial motions which were denied by the trial court following hearings on April 21 and 28, 1975. An appeal was taken to this court but was dismissed because the orders denying defendant's pretrial motions were not appealable. As a

result of the appeal, the proceedings were delayed until October of 1976.

At that time the case was reassigned to the Honorable EDWIN C. DAHLBERG, county judge of Rock county, and a special prosecutor was appointed. The defendant's second trial was finally commenced on October 25, 1976, well over two years after charges had been brought against him.

Following the selection of the jury and the opening statement by the special prosecutor, the matter adjourned to chambers at which time the defendant informed the court that he was not satisfied with his attorney's representation and wished to proceed with his own defense. When asked why he wished to proceed alone, the defendant responded:

"Well, sir, one thing I realize, the gravity of it calls for competence. I, and every one of my students included, seem to be dissatisfied with the performance just because—It is nothing against Mr. [Sydney] Eisenberg because he served me faithfully on many occasions. However, at this time I feel more than competent. I feel more than confident, and I am well prepared, and I have studied this for a period of two years from various sources, from judges to victims, to various facets of the whole experience, and I feel more than qualified, sir, and I feel I can give a dignified, honorable, polite and refined performance. And, basically, my motivation is in my heart. Things just don't feel right today and, well, when they don't feel right in my heart, I don't ignore it because I followed my heart on other occasions and it seems to ring true. And I really, in conclusion, would appreciate this."

Fearing that the case would end in another mistrial and further delay final disposition of the matter if the defendant was allowed to proceed *pro se*, the special prosecutor requested that defendant's attorney not be permitted to withdraw.

However, the attorney stated that the defendant was competent to handle his own defense and should be allowed to do so. He stated that the defendant knew the case better than anybody and had in fact been dominant in preparing the case. Although he also was prepared for the case and was willing to proceed, the attorney felt that the defendant was entitled to conduct his own defense if he thought he could do a better job.

Still unconvinced of the wisdom of allowing the defendant to proceed *pro se*, the trial court questioned the defendant regarding his qualifications. When asked if he had any legal training, the defendant stated he had close lawyer friends who taught him, including a roommate who was studying law. He stated he had even studied law informally himself and, while in high school, had represented his student body in some type of judicial proceeding.

The trial court nevertheless advised the defendant that he had no formal legal training and that the case would be tried according to certain rules that the court was required to follow. It informed the defendant that, "while the Court would, if a defendant was representing himself, lean over backwards in some of the rules of evidence, it . . . would be unable to assist [him] in trying [his] case." On several occasions the trial court repeated the old adage that "a lawyer who represents himself has a fool for a client," and pointed out to the defendant that the truth of that statement was compounded where a nonlawyer attempted to defend himself.

However, the defendant continued to assert his confidence in his own ability to conduct his defense.

The trial court questioned the defendant one last time concerning his election:

"Do you understand that this is a courtroom, we operate under certain legal rules, and you will be expected to comply with those. I will perhaps give some latitude because you are not trained in the law, but you will have

to, even though you are not educated in the law, try your lawsuit in accordance with those rules. Do you understand that?"

The defendant stated he understood "fully" and the trial court granted his request. From this point in the proceeding forward, the defendant conducted his own defense.

Now, having failed at his attempt to defend himself, the defendant seeks reversal of his conviction and a new trial on the grounds that the trial court failed to conduct an adequate examination to determine whether his waiver of counsel was knowing and voluntary and whether he was competent to defend himself.

We cannot accept the defendant's contention that he must be granted a new trial. We conclude from the record that his waiver of his right to counsel was both knowing and voluntary, and that he was competent to waive counsel and proceed *pro se*. We also conclude that the trial court did not err in refusing to honor the defendant's attempted withdrawal of his waiver on the second day of trial.

In what is regarded as the seminal case on waiver of the right to counsel, the United States Supreme Court defined waiver as "an intentional relinquishment or abandonment of a known right or privilege," and cautioned that any such waiver must be "intelligent and competent." *Johnson v. Zerbst, supra,* 304 U.S. at 464, 465 (1938). It further stated: "The determination of whether there has been an intelligent waiver of the right to counsel must depend, in each case, upon the particular facts and circumstances surrounding that case, including the background, experience and conduct of the accused." *Id.* at 464.

Throughout the years since *Johnson* the question of precisely what the accused must be made aware of in

order for his waiver of counsel to be valid has not been clearly and unequivocally answered. In *Von Moltke v. Gillies, supra,* 332 U.S. at 724, Justice Black, writing for a plurality of the court, listed a number of areas in which the trial judge should examine the accused to determine whether his waiver of counsel is knowingly made. They include: ". . . the nature of the charges, the statutory offenses included within them, the range of allowable punishments thereunder, possible defenses to the charges and circumstances in mitigation thereof, and all other facts essential to a broad understanding of the whole matter."

However, the vast majority of courts have not required a colloquy between the trial judge and the defendant covering each factor specified in *Von Moltke* in order to find a valid waiver. *Hsu v. United States,* 392 A.2d 972, 983 (D.C. Cir. 1978). Instead, they have:

"looked to the substance of the *Von Moltke* formulations, and not to its formulas. . . . [and] . . . have nonetheless viewed the question of waiver of counsel as ultimately an issue, irrespective of the trial court's fulfillment of its *Von Moltke* duties, of whether the accused knowingly and intelligently chose to waive counsel." *Spanbauer v. Burke,* 374 F.2d 67, 72 (7th Cir. 1966), *cert. denied,* 389 U.S. 861 (1967). *See also, United States v. Warner,* 428 F.2d 730, 734 (8th Cir. 1970).

This essentially *ad hoc* approach to the question of waiver of counsel was supported by the United States Supreme Court in *Faretta v. California, supra,* 422 U.S. at 835. Describing the conditions under which a defendant's request to proceed *pro se* should be granted, the court stated:

"When an accused manages his own defense, he relinquishes, as a purely factual matter, many of the traditional benefits associated with the right to counsel. For this reason, in order to represent himself, the ac-

cused must 'knowingly and intelligently' forego those relinquished benefits. *Johnson v. Zerbst,* 304 U.S., at 464–465. Cf. *Von Moltke v. Gillies,* 332 U.S. 708, 723–724 (plurality opinion of Black, J.). Although a defendant need not himself have the skill and experience of a lawyer in order competently and intelligently to choose self-representation, he should be made aware of the dangers and disadvantages of self-representation, so that the record will establish that 'he knows what he is doing and his choice is made with eyes open.' *Adams v. United States ex rel. McCann,* 317 U.S., at 279."

In *Maynard v. Meachum,* 545 F.2d 273, 279 (1st Cir. 1976), the first circuit concluded that Faretta's "colloquial formulation of the standard suggests that there is no particular piece of information that is essential to an effective waiver of counsel." What is required, that court concluded, "is a sense of the magnitude of the undertaking and the 'disadvantages of self-representation', *id:* an awareness that there are technical rules governing the conduct of a trial, and that presenting a defense is not a simple matter of telling one's story." "In addition," the court stated, "the accused should have a general appreciation of the seriousness of the charge and of the penalties he may be exposed to before deciding to take a chance on his own skill." *Id.*

We regard the view expressed by the first circuit in *Maynard v. Meachum, supra,* as a correct statement of the law with respect to a knowing waiver of the right to counsel. Accordingly, we hold that in order for an accused's waiver of his right to counsel to be valid, the record must reflect not only his deliberate choice to proceed without counsel, but also his awareness of the difficulties and disadvantages of self-representation, the seriousness of the charge or charges he is facing and the general range of possible penalties that may be imposed if he is found guilty. Unless the record reveals the de-

fendant's deliberate choice and his awareness of these facts, a knowing and voluntary waiver will not be found.

Turning to the facts of this case, we first note that, in accepting the defendant's waiver, the trial court did not specifically question him as to each of the factors we have mentioned. However, it does not follow from this that no valid waiver occurred and the conviction must be reversed. While it is true that a valid waiver must affirmatively appear on the record, and the best way to accomplish this is for the trial court to conduct a thorough and comprehensive examination of the defendant as to each of the factors mentioned, it is the accused's apprehension, not the trial court's examination, that determines whether the waiver is valid. If the defendant's understanding of the necessary facts appears in the record other than in response to specific questions put to him by the trial court, a knowing waiver can be found. *Spanbauer v. Burke, supra; Maynard v. Meachum, supra.*

The record in this case amply demonstrates such understanding on the part of the defendant. Shortly after the action was commenced he was given a copy of the complaint, and, later, a copy of the information. Both of these documents set forth the elements of the offense with which he was charged. He was informed at least twice by the court that the offense carried a maximum penalty of thirty years' imprisonment and this information was also contained in the complaint. He also stated on at least two occasions that he understood the nature of the charges against him.

The defendant's appreciation of the seriousness of the charges he was facing is also evident from his response to the trial court's inquiry as to why he wished to proceed alone. He stated that the gravity of the situation called for competence and he felt greater confidence in

his own ability to defend himself than in his attorney's. He also spoke of the effect the charges against him had had on his reputation and his family and insisted that he be allowed to upright his name and prove he was not a felon. In light of this response, it is clear the defendant regarded the matter as serious.

It is similarly apparent that the defendant was also aware of the difficulty of self-representation. Three times the trial court advised the defendant of the proverbial fool who attempts to defend himself. It advised him at least twice that there are established rules governing the manner in which a case is tried and evidence presented and that he would be bound by them, despite his lack of formal training in the law.

Furthermore, the defendant had strenuously objected to being forced to proceed *pro se* at his first trial for precisely this reason. When the trial court decided to regard the defendant's repeated failure to retain an attorney during the six weeks prior to his trial as an election to proceed *pro se,* the defendant objected, claiming, "I can't handle this. I don't know all these small fine points of law." Against this background, we regard the defendant's present claim that he was unaware of the difficulties of self-representation as nothing short of ludicrous. He knew exactly what he was doing and his choice was made with eyes open. Under *Faretta,* his waiver was valid.

The defendant further contends, however, that, even if we conclude his waiver of counsel was knowing and voluntary, he should nevertheless have been prevented from representing himself because he lacked the mental competence to do so. He points out that the trial court appears to have assumed from the fact that he had been found competent to stand trial that he was therefore competent to represent himself. However, he argues that these competencies are not the same and that the trial

court erred in failing to make a specific determination as to his capacity to defend himself.

The question of whether an accused may be found competent to stand trial and yet incompetent to conduct his own defense has been addressed by only a few courts.

In *Westbrook v. Arizona*, 384 U.S. 150 (1966), the United States Supreme Court, in a short *Per Curiam* opinion, summarily reversed a conviction of a defendant who had been allowed to defend himself after he had been found competent to stand trial, saying: "Although the petitioner received a hearing on the issue of his competence to stand trial, there appears to have been no hearing or inquiry into the issue of his competence to waive his constitutional right to the assistance of counsel and proceed, as he did, to conduct his own defense." While it is unclear from the context of the statement and the brevity of the opinion in which it appears, exactly what was intended, at least two courts have concluded that *Westbrook* ". . . indicate[s] that the standard of competence for making the decision to represent oneself is vaguely higher than the standard for competence to stand trial. *United States ex rel. Konigsberg v. Vincent*, 526 F.2d 131, 133 (2d Cir. 1975). *See also, State v. Kolocotronis*, 73 Wash.2d 92, 101, 436 P.2d 774 (1968).

Other courts, however, have not read *Westbrook* in this way. In *People v. Reason*, 37 N.Y.2d 351, 334 N.E.2d 572, 372 N.Y.S.2d 614 (1975), the New York Court of Appeals rejected such a distinction and affirmed the conviction of a *pro se* defendant who had during the course of the trial drifted into irrelevant and nearly incoherent discourses. The court reasoned that the standard used to determine whether a defendant was competent to stand trial was originally designed to determine whether a defendant was capable of defending himself, and therefore no higher standard of competency was needed. In addition, it felt that "from a practical view-

point it would be even more difficult to formulate a workable, and presumably higher, standard of competency which would not infringe on the defendant's constitutional right 'to appear and defend in person' [N.Y. Const., art. I, sec. 6; *People v. McIntyre,* 36 N.Y.2d 10]." 37 N.Y.2d at 354.

To the same effect is *Curry v. Superior Court,* 75 Cal. App.3d 221, 226–227, 141 Cal. Rptr. 884 (1977), wherein the California Court of Appeals held:

". . . the sole issue to be determined in a *Faretta* hearing is whether the defendant has the mental capacity to waive his constitutoinal right to counsel with a realization of the probable risks and consequences of his action. Whether or not a defendant is competent to act as his own lawyer is irrelevant. The fact that the defendant 'may conduct his own defense ultimately to his own detriment, his choice must be honored out of that respect for the individual which is the lifeblood of the law [citation].' "

After carefully considering the question, we have concluded that competency to stand trial is not the same as competency to proceed *pro se* and that, even though he has knowingly waived counsel and elected to do so, a defendant may be prevented from representing himself.

The standard for determining competency to stand trial is whether one is able to understand the proceedings against him and to assist in his own defense. Sec. 971.13, Stats. This test assumes the defendant will have representation and that he will be required only to assist in his defense. Certainly more is required where the defendant is to actually conduct his own defense and not merely assist in it. As the United States Supreme Court noted in *Massey v. Moore,* 348 U.S. 105, 108 (1954): "One might not be insane in the sense of being incapable

of standing trial and yet lack the capacity to stand trial without benefit of counsel."

Other disabilities, besides mental diseases and defects of the type that render one incompetent to stand trial, may likewise make meaningful self-representation impossible. *Faretta* itself indicates that although technical legal knowledge is not relevant, literacy and a basic understanding over and above the competence to stand trial may be required. 422 U.S. at 835. Surely a defendant who, while mentally competent to be tried, is simply incapable of effective communication or, because of less than average intellectual powers, is unable to attain the minimal understanding necessary to present a defense, is not to be allowed "to go to jail under his own banner." *United States v. Denno,* 348 F.2d 12, 15 (2d Cir. 1965). Neither the state, nor the defendant, is in any sense served when a wrongful conviction is easily obtained as a result of an incompetent defendant's attempt to defend himself. *See, Faretta v. California, supra,* 422 U.S. at 839–840 (Burger, C. J. dissenting); *Carpenter v. Dane County,* 9 Wis. 249 (\*274), 251 (\*276) (1859). Thus, despite the fact that a defendant has been found competent to stand trial, it may nevertheless be determined that he lacks the capacity to represent himself.

At the same time, however, it must be recognized that the question of whether a defendant is capable of self-representation is uniquely a question for the trial court to determine. It is the trial judge who is in the best position to observe the defendant, his conduct and his demeanor and to evaluate his ability to present at least a meaningful defense.

When a defendant expresses a desire to proceed *pro se,* the trial court should examine him on the record to determine not only whether his waiver of counsel is

knowing and voluntary, but also to determine whether he possesses the minimal competence necessary to conduct his own defense. Factors to consider in making this second determination include the defendant's education, literacy, fluency in English, and any physical or psychological disability which may significantly affect his ability to communicate a possible defense to the jury. However, since *Faretta* indicates that persons of average ability and intelligence are entitled to represent themselves, a timely and proper request should be denied only where a specific problem or disability can be identified which may prevent a meaningful defense from being offered, should one exist.

Moreover, even after the request to proceed *pro se* has been granted and the defendant has begun his defense, the trial court has a continuing responsibility to watch over the defendant and insure that his incompetence is not allowed to substitute for the obligation of the state to prove its case. If, during the course of the trial, it becomes apparent that the defendant is simply incapable, because of an inability to communicate or because of a complete lack of understanding, to present a defense that is at least prima facie valid, the trial court should step in and assign counsel. But because the defendant is not to be granted a second chance simply because the first is going badly, counsel should be appointed after trial has begun, or a mistrial ordered, only where it appears the defendant should not have been allowed to proceed *pro se* in the first place.

We realize, of course, that the determination which the trial court is required to make must necessarily rest to a large extent upon the judgment and experience of the trial judge and his own observation of the defendant. For this reason, the trial court must be given sufficient latitude to exercise its discretion in such a way as to insure that substantial justice will result. On review, there-

fore, its determination that the defendant is or is not competent to represent himself will be upheld unless totally unsupported by the facts apparent in the record.

Turning to the case before us, although the trial court apparently failed to appreciate the distinction we have noted between competency to proceed and competency to proceed *pro se,* it does not follow that the defendant's conviction must therefore be set aside. We are convinced from our reading of the record that the defendant possessed more than the minimal competence necessary to conduct his own defense. The record reveals that he is literate and, even though he had not graduated from high school, he had studied informally at a nearby university with several of his friends. The defendant claimed that he had also studied law informally with several lawyer friends and a law student roommate. His verbal skills and intellectual ability were certainly adequate, under the rationale of *Faretta,* to permit him to exercise his right of self-representation.

As for the defendant's mental competency to conduct his own defense, we recognize, as did the trial court, that his beliefs and manner are certainly "somewhat out of the ordinary." It may be that the defendant's conduct at trial and his numerous references to astrology and religion may have antagonized some members of the jury. But it is also apparent that the defendant suffered no mental defect which prevented his presentation of a defense. The proof of this fact lies in his actual handling of the case.

It is clear from the defendant's cross-examination of the complainant and his direct examination of several defense witnesses that he was attempting to establish the defense of consent. He questioned the complaining witness extensively about her prior sexual conduct and her behavior on the night of the alleged rape. He also

called a number of witnesses of his own, attempting to demonstrate a lack of moral character on her part.

And, in addition to the basic substantive defense of consent, the defendant's handling of the case also reveals his awareness of the more technical defense of lack of venue. He knew that if the crime occurred in Illinois, rather than Walworth county, he would have a complete defense. Accordingly, he attempted to prove that the location of the crime, as described by the complainant, was in Illinois.

While the defendant was unsuccessful in establishing these defenses to the satisfaction of the jury, he did as well in attempting to do so, as many other laymen or lawyers could have done. For this reason we cannot say that he lacked the minimal competence needed to exercise his right of self-representation.

Lastly, with respect to his right to counsel, the defendant contends that the trial court erred in refusing to honor his attempt to withdraw his waiver of counsel on the second day of trial. The defendant's request followed the trial court's ruling excusing a witness from the stand whom the defendant had continually failed to question. Apparently frustrated, the defendant stated:

"It's my constitutional right to proceed with counsel and I can't feel that my rights are being satisfied here because the process cannot be discussed without some sort of emotional impulse here and so therefore, it is my wish right now to call a lawyer, sir."

The trial court responded that defendant had made his election and was bound by it. It denied the defendant's request.

We conclude that the trial court was justified in refusing to adjourn the proceeding to allow the defendant an opportunity to obtain counsel at that time.

Relying on the interest of the state in maintaining the integrity of the trial process and the orderly administra-

tion of justice, this court has held that the right to counsel cannot be manipulated by a defendant as a tool for obstruction. *Hamiel v. State,* 92 Wis.2d 656, 672, 285 N.W.2d 639 (1979) ; *Rahhal v. State,* 52 Wis.2d 144, 147–148, 187 N.W.2d 800 (1971).

The record in this case shows that the defendant had already successfully manipulated his right to counsel to delay his trial for a period of several months prior to his earlier mistrial which was itself due in part to the defendant's abuse of his right to counsel. The attorney dismissed by the defendant shortly after his second trial began was the fourth to undertake the defendant's representation. On appeal, the defendant has added two more to the list. Had the trial court honored the defendant's request to allow him leave to retain another attorney, not only would a delay in the proceedings have resulted at that time, but given the defendant's propensity to change attorneys, further delays could have been expected later on. Having validly waived his right to counsel and elected to proceed *pro se,* the defendant was not entitled to obtain new representation once his trial was in progress.

Of the remaining issues raised by the defendant, only one merits more than summary discussion. It involves the use at trial of certain polygraph evidence relating to the credibility of the complaining witness' testimony. Defendant contends that the trial court erred in admitting this evidence because, first, there was no valid stipulation entered into pursuant to the mandate of *State v. Stanislawski,* 62 Wis.2d 730, 216 N.W.2d 8 (1974), and, second, even if a valid stipulation did exist, it was withdrawn on the morning before trial began.

In *State v. Stanislawski, supra,* this court rejected its earlier absolute bar of the use of polygraph evidence at

trial and held that, when certain requirements were ful-filled, such evidence would be admissible on the issue of the defendant's or a witness' credibility. The first of the requirements set forth in *Stanislawski* is that there must be a written stipulation signed by the prosecutor, de-fense counsel and the person taking the test providing for the defendant's or witness' submission to the test and for the subsequent admission at trial of the graphs, and the examiner's opinion thereon on behalf of either the defendant or the state. 62 Wis.2d at 742–743. In cases decided since *Stanislawski* this court has stead-fastly refused to withdraw from its original position that a written stipulation, signed by the appropriate parties, is an essential prerequisite to the admission of such evidence at trial. *See, State v. Streich,* 87 Wis.2d 209, 219, 274 N.W.2d 635 (1979), and cases cited therein.

The record in this case contains two written stipula-tions providing for the admission at trial of evidence relating to polygraph examinations to be given to both the defendant and the complaining witness. However, the defendant contends that the results of the test ad-ministered to the complaining witness should not have been admitted because neither he, nor his attorney, had signed the stipulation relating to her taking the test.

While it is true that the stipulation providing for the admission of the results of polygraph examination to be administered to the complaining witness was not signed by defense counsel, the stipulation providing for the ad-mission of the defendant's test results contained as a precondition the requirement that the complaining wit-ness also take the test under the same terms and con-ditions. This stipulation was signed by the defendant and his then attorney, as well as the prosecutor. Pursuant to the first stipulation the second stipulation was ob-tained which provided for the complaining witness to submit to a polygraph examination the results of which

were to be admissible. Apparently due to an oversight, this stipulation was signed only by the complaining witness and the prosecutor.

However, despite the requirement of a signed stipulation, we do not view the oversight as fatal. Because each of the stipulations expressly refers to the other and incorporates each other's provisions, we conclude that both can be properly regarded as but one stipulation. Furthermore, because all of the required signatures appear on the two documents taken as a whole, we conclude that the trial court did not err in ruling that the test results were admissible against the defendant.

As for the defendant's alternative contention that, even assuming a proper stipulation did exist, it was withdrawn on the morning of trial, there is simply no authority for such a proposition. To allow a party to withdraw a valid stipulation for the admission of polygraph evidence after the results have been obtained would defeat the whole purpose of requiring a stipulation in the first place. The purpose of the stipulation rule is "to assure the fairness and reliability in the introduction of polygraph results in evidence." *Lhost v. State,* 85 Wis.2d 620, 646, 271 N.W.2d 121 (1978). To allow a party to pick and choose on the basis of what results are obtained whether or not the polygraph evidence will be admissible would significantly curtail the function of the polygraph instrument as a tool for testing the credibility of those who agree to submit to it. For this reason, neither party may withdraw a valid stipulation after the test has been administered.

The remaining issues raised by the defendant are regarded by us as having little or no merit. Accordingly, our discussion of them will be minimal.

Defendant's contention that no factual finding on the question of venue was ever made is incorrect.

While venue is not an element of a crime, it is nevertheless a fact which must be proved beyond a reasonable doubt in order for a conviction to result. *State v. Dombrowski*, 44 Wis.2d 486, 501–502, 171 N.W.2d 349 (1969). The trial court specifically informed the jury of this in instructing them as to the law they were to apply in determining whether or not the defendant was guilty. It stated:

"You are further instructed that before you may find the defendant guilty, you must find beyond a reasonable doubt as that term will be defined for you that the defendant's acts, if any, occurred within the corporate limits of Walworth County, Wisconsin."

In light of this instruction, it must be concluded that the jury's verdict of guilty contained the implicit finding that venue had been established beyond a reasonable doubt. The testimony presented at trial was sufficient to support the jury's finding.

The defendant's contention that the trial court failed to adequately inquire into the circumstances surrounding his in-custody statement to the Walworth county authorities must fail because the trial court had no obligation under the circumstances to make such an inquiry.

In *State ex rel. Goodchild v. Burke*, 27 Wis.2d 244, 264, 133 N.W.2d 733 (1965), *cert. denied*, 384 U.S. 1017, this court set forth the procedure trial courts are to follow in determining the voluntariness of statements made by an accused when the admission of such statements is subsequently challenged. However, in this case, the in-custody statement made by the defendant was never challenged. In fact, the defendant expressly stated he had no objection to the admission of his statement. Absent such an objection to the admissibility of a statement or a motion to suppress, a trial court is under no obligation to conduct a separate hearing and make a specific find-

ing as to whether the statement is voluntary. *Huebner v. State,* 33 Wis.2d 505, 518, 147 N.W.2d 646 (1967); *Jacobs v. State,* 50 Wis.2d 361, 364, 184 N.W.2d 113 (1971).

Our earlier discussion regarding the necessity of a proper stipulation before polygraph evidence is admissible is sufficient to dispose of the defendant's contention that the trial court erred in preventing him from presenting the testimony of an additional polygraph examiner who had administered a test to him. No stipulation had been entered into regarding the results of this test. In addition, the examiner had retained neither the questions he had asked, nor the charts upon which he had based his conclusions, thereby making adequate cross-examination impossible. The trial court's ruling that the examiner would not be allowed to testify under these circumstances was proper.

The defendant next contends that his conviction should be reversed because he was denied due process as a result of the "circus atmosphere" in which his trial took place and also as a result of the trial court's mechanical application of the rules of evidence and trial procedure.

In disposing of this contention, we do not intend to repeat every example the defendant has given of what he regards as deficiencies in proper courtroom decorum or the trial court's mechanical application of the law. Suffice it to say that we have reviewed the record in this case and have concluded that to the extent the trial did degenerate somewhat from the proper level of formality, it was due almost entirely to the continual interruptions and impertinent behavior of the defendant. Rather than finding error on the part of the trial court, we wish to commend it for its patience and evenhandedness in presiding over what was clearly a very difficult and frustrating trial. Despite the difficulty of the situation, our review of the record reveals that the trial court did maintain adequate control to insure that the

defendant was tried fairly and in accordance with the law.

Its rulings on evidentiary and procedural matters were fully justified on the basis of the record before it. The defendant's propensity to make his own speeches instead of questioning witnesses, to ask irrelevant or improper questions, and to challenge the answers he did receive on those occasions when he did ask proper questions required at times stern rulings on the part of the trial court. Thus, in certain instances, but only after repeated warnings, the defendant's questioning was terminated and witnesses were excused. In addition, to avoid further delay, the trial court at certain points set time limits for the defendant to make a particular strategic decision or continue his questioning. While these rulings may seem harsh when considered by themselves, viewed in the context in which they were made, they were not improper.

Finally, we reach the last issue defendant has raised on this appeal. He contends, on the basis of claimed information which is not a part of the record, that a fraud may have been perpetrated on the court by one of the polygraph examiners who testified at his trial. Defendant states in his brief that, subsequent to his testifying in this case, doubts have been raised as to the competence of this examiner and he is no longer recognized as a qualified polygraph examiner by the state, the federal government or the Society of Polygraph Examiners.

The unsupported allegations defendant has made in his brief, even if true, hardly amount to a fraud being perpetrated upon the court. At most they constitute a basis for challenging the qualifications, and therefore the credibility of an expert witness who testified for the state. However, because this information is not a part of the record before us, it cannot be considered in this proceeding. Accordingly, we do not decide this issue.

*By the Court.*—Judgment and order affirmed.