STATE of Wisconsin,
Plaintiff-Respondent,†

v.

Rashaad A. IMANI,
Defendant-Appellant.

Court of Appeals

*No. 2008AP1521–CR. Submitted on briefs February 19, 2009.
—Decided June 3, 2009.*

2009 WI App 98

(Also reported in 771 N.W.2d 379.)

† Petition to review granted 9/24/09.

505

On behalf of the defendant-appellant, the cause was submitted on the briefs of *Basil M. Loeb*, Wauwatosa.

On behalf of the plaintiff-respondent, the cause was submitted on the brief of *Thomas J. Balistreri*, assistant attorney general, and *J.B. Van Hollen*, attorney general.

Before Brown, C.J., Anderson, P.J., and Snyder, J.

¶ 1. ANDERSON, P.J. Rashaad A. Imani appeals from a judgment convicting him of one count each of armed robbery, as party to a crime, and possession of a firearm by a felon, both as a repeater. His challenge arises from the denial of a pretrial motion to represent himself at trial. We conclude the evidence was more than sufficient for the jury to convict him. But because we also conclude that the trial court failed to conduct the waiver-of-counsel colloquy required by *State v. Klessig*, 211 Wis. 2d 194, 564 N.W.2d 716 (1997), we must reverse and remand for a new trial.

¶ 2. Trial testimony revealed that on March 1, 2006, two masked men wearing parkas, both armed with firearms, entered the Guaranty Bank inside the Pick and Save Food Store on Appleton Avenue in Menomonee Falls. One of them, identified by a witness

as an African American, jumped over the front counter and into the bank vault where both bank employees were standing. The employees acquiesced to the demands of the armed intruder and surrendered a silver-metallic box of cash containing in excess of $100,000. The armed man then slid the box with the money across the counter to the other masked man and jumped back over the counter, leaving a footprint, and departed with the other man and the box in a white Nissan. As they drove away, a store employee recorded their license plate number and gave it to the police.

¶ 3. At the same time, Menomonee Falls Police Officer Erich Uebersohn was on patrol and was located on Appleton Avenue outside the parking lot of the Guaranty Bank. As he was approaching the intersection, he heard a loud screeching noise coming from a white Nissan, whose driver he surmised had braked upon seeing him. The Nissan's driver then sped through the intersection, disregarding the red light. Uebersohn said he could see two black males in the Nissan and that the driver appeared to be holding a gun. After the Nissan proceeded past Uebersohn at a high rate of speed, he initiated pursuit, following it south on Appleton Avenue towards Milwaukee. While in pursuit, he was joined by other officers; dispatch informed the officers that a white Nissan with an identical license plate number as the car they were pursuing had just been involved in a bank robbery.

¶ 4. The car pursuit ended when the Nissan crashed into some small trees while attempting a turn onto Hampton Avenue. Uebersohn saw only the Nissan's passenger climb out of the driver's side door and proceeded to give chase on foot. Uebersohn did not see the driver, who had apparently already escaped. The

510

foot chase ended when the passenger managed to disappear in a nearby alley.

¶ 5. By this time, other officers had arrived at the scene of the crash and located a metal bank box containing money, some of which was marked as belonging to the same Guaranty Bank branch on Appleton Avenue that was robbed.

¶ 6. Thanks to some quick-thinking citizens, the suspects did not entirely disappear. The suspect who had eluded the police in the alley had jumped into a car wielding his gun and demanded that the car's driver take him away. The driver, aware of the nearby police presence at the crash scene, returned to the scene in the midst of the police and, together with his passenger, bailed out and notified the officers of the armed man in their backseat. The suspect, by now aware of the ruse, exited the car and ran. Bystanders pointed out to police where he had run and, after a second foot pursuit, the suspect was arrested. The suspect's black gun and latex gloves were found in the vicinity of the arrest. The suspect was later identified as Raziga Imani, cousin of the defendant, Rashaad Imani, and admitted his role in the robbery.

¶ 7. A footprint in the snow that was similar to the one found at the bank, along with a black parka and mask similar to those involved in the robbery were found about a block from the crash near the Burrito Bueno Restaurant at 8238 West Appleton Avenue.

¶ 8. At the same Burrito Bueno Restaurant, the other suspect was seen jumping over the fence and getting into a parked Buick Riviera in front of the Milwaukee Wash Machine Company a few doors down. After getting into the Buick, the suspect informed the driver, James Dukes, that he had just robbed a bank; he displayed a silver gun and demanded that Dukes drive

him away. The suspect got out of the car at 90th and Villard. Dukes later identified Rashaad Imani as the man who carjacked him. Two fingerprint examiners verified that the latent fingerprint lifted from the Buick's door handle belonged to Rashaad Imani.

¶ 9. Rashaad, while in the Waukesha County Jail after his arrest, told a fellow prisoner that he had robbed the Guaranty Bank with his cousin. His cousin Raziga testified at trial about his own role in the robbery and that Rashaad was his accomplice.

¶ 10. Rashaad pled not guilty and a joint trial date for both defendants was set. Rashaad moved pretrial to suppress Dukes' in-court identification of him on grounds that television news coverage may have tainted it. When the court denied the motion, Rashaad advised the court he wanted to represent himself. He explained that he was "very dissatisfied" with his counsel's representation and follow-through, and believed he had a "fuller defense prepared that I've been preparing myself," and "ain't nobody going to represent myself better than me."

¶ 11. The court asked Rashaad why he thought he was competent to represent himself. Rashaad told the court he had been "working on" his case for thirteen months, had a tenth-grade education, reads and writes English on a college level, was in court on at least five other matters, every time with a lawyer, and had seen his lawyer question witnesses at the preliminary hearing. No discussion was had about the seriousness of the charges against Rashaad, the penalties that could be imposed, or the drawbacks or difficulties attendant to proceeding pro se.

¶ 12. The court denied the motion "to preserve the trial date, maintain the opportunity to be prepared and go forward, and to not make a flippant short[-]term

or immature decision go into effect." Noting that a two-defendant trial, with one defendant already a pro se defendant, makes "any potential threat to keeping the schedule . . . an even bigger issue," the court said it was "willing to hear the motion again . . . but it is going to have to be in a context where I know the trial date is not going to be jeopardized." Rashaad responded that he "ha[d] no problem" with the current trial date. The court also said that if given notice, it would consider letting Rashaad participate in opening statement, closing argument and questioning the witnesses. Rashaad did not renew the motion. The jury returned guilty verdicts on both counts.

¶ 13. On appeal, Rashaad contends that the trial court wrongly deprived him of his constitutional right to represent himself because he established a knowing, intelligent and voluntary waiver of his right to counsel and that he was competent to proceed pro se. We agree there was error, but disagree that Rashaad established a valid waiver of counsel. Our review of the motion hearing transcript persuades us that Rashaad could not have established a valid waiver because the trial court failed to engage him in the colloquy *Klessig* requires.

¶ 14. A defendant has a constitutional right to self-representation. *Id.* at 203. When a defendant seeks to exercise that right, the trial court must ensure that the defendant knowingly, intelligently and voluntarily waives the right to counsel, and is competent to proceed pro se. *Id.* The court

> must conduct a colloquy designed to ensure that the defendant (1) made a deliberate choice to proceed without counsel, (2) was aware of the difficulties and disadvantages of self-representation, (3) was aware of

513

the seriousness of the charge or charges against him [or her], and (4) was aware of the general range of penalties that could have been imposed on him [or her].

*Id.* at 206. If the court concludes the waiver is not knowing, intelligent and voluntary, and the defendant is not competent to conduct his or her own defense, it must deny the motion or deprive the defendant of his or her constitutional right to the assistance of counsel. *Id.* at 203–04. But if the defendant meets both conditions, the court must allow him or her to proceed pro se or deprive the defendant of the right of self-representation. *Id.* at 204. Denial of either right is structural error subject to automatic reversal. *See State v. Harvey*, 2002 WI 93, ¶ 37, 254 Wis. 2d 442, 647 N.W.2d 189.

¶ 15. We independently determine whether the facts of record establish that a waiver of counsel was knowingly and voluntarily made. *See Klessig*, 211 Wis. 2d at 204. Before *Klessig*, an appellate court could find a valid waiver without specifically questioning the defendant as long as the record reflected a deliberate choice to proceed without counsel and an awareness of the difficulties and disadvantages of self-representation, the seriousness of the charges and the potential penalties. *See Pickens v. State*, 96 Wis. 2d 549, 563–64, 292 N.W.2d 601 (1980), *overruled on other grounds and competency grounds affirmed, Klessig*, 211 Wis. 2d at 206, 212. It was "the accused's apprehension, not the trial court's examination, that determines whether the waiver is valid." *Pickens*, 96 Wis. 2d at 564. But *Klessig* overruled that aspect of *Pickens* and expressly mandated that the trial court engage the defendant in a colloquy specifically addressing these concerns. *Klessig*, 211 Wis. 2d at 206. Here, the court did not even touch on these questions.

¶ 16. The competency prong also falls short. To determine whether a defendant is competent to proceed pro se, the trial court should consider

> the defendant's education, literacy, fluency in English, and any physical or psychological disability which may significantly affect his [or her] ability to communicate a possible defense to the jury . . . . [T]he competency determination should not prevent persons of average ability and intelligence from representing themselves unless a specific problem or disability can be identified which may prevent a meaningful defense from being offered . . . .

*Id.* at 212 (citations omitted). The determination of incompetency must appear in the record, *id.*, and we will uphold it unless totally unsupported by the facts of record, *Pickens*, 96 Wis. 2d at 568–70.

¶ 17. Here, the court observed that it "[did not] know that much about [Rashaad's] capability." It said the sole information it had on his education and background was that he had a tenth-grade education, claimed an ability to read and write at a college level, and had "observational" courtroom experience but lacked "experience actually conducting proceedings like a criminal court trial." Technical legal knowledge is not relevant, however. *Id.* at 568. Moreover, the court identified no specific problem or disability which might significantly affect Rashaad's ability to communicate a meaningful defense. *See Klessig*, 211 Wis. 2d at 212. The competency determination, if such it was, was not properly supported.

¶ 18. Instead, the court denied the motion "to preserve the trial date." Rashaad did not move for a continuance. The court also appeared to be concerned

about conducting an efficient trial. But if we sacrifice constitutional rights to protect a court's schedule from a hypothetically disordered and, therefore, lengthened trial, the right of "persons of average ability and intelligence" to proceed pro se would be virtually meaningless. We have said that "mere inconvenience to the court is insufficient to deny a defendant's right to counsel." *State v. Verdone*, 195 Wis. 2d 476, 482, 536 N.W.2d 172 (Ct. App. 1995). Because the right to counsel and the right to represent oneself both spring from the Sixth Amendment to the United States Constitution and article I, section 7 of the Wisconsin Constitution, *see Klessig*, 211 Wis. 2d at 201–03, we conclude that mere inconvenience to the court also is insufficient to deny a defendant's right to self-representation.[1]

¶ 19. Next, Rashaad contends the evidence was insufficient to convict him. We address this issue even though we reverse the judgment and remand for a new trial because if the evidence is not sufficient to support

[1] The court did not salvage its decision by offering to permit Rashaad to participate in opening statement, closing argument or questioning the witnesses. A defendant has no right to simultaneously proceed with counsel and pro se. *See Moore v. State*, 83 Wis. 2d 285, 301–02, 265 N.W.2d 540 (1978). In fact, "hybrid representation" generally is prohibited. *See United States v. Oreye*, 263 F.3d 669, 672 (7th Cir. 2001); *but cf. Locks v. Sumner*, 703 F.2d 403, 407–08 (9th Cir. 1983) (suggesting hybrid representation should be left to court's discretion). We agree with the court's own assessment that it "is almost always the wrong tactical move . . . [a]nd it gets pretty complicated and messy" due to the confusion created between defendant as defendant and defendant as advocate. *See United States v. Oakey*, 853 F.2d 551, 553 (7th Cir. 1988) (stating that hybrid representation is disfavored because it allows a defendant to address the jury as counsel without being cross-examined as defendant).

his conviction, the federal and state constitutional guarantees against double jeopardy may preclude retrying him. *See State v. Perkins*, 2001 WI 46, ¶ 47, 243 Wis. 2d 141, 626 N.W.2d 762. Rashaad asserts that the State's case rested on circumstantial evidence and that some of the witnesses—his co-defendant, who benefitted from testifying; a witness, who admitted there was "bad blood" between them; an incarcerated informant; and an eyewitness, who first identified Rashaad months later—lacked credibility.

¶ 20. On a challenge to the sufficiency of the evidence, we may overturn the verdict only if the trier of fact could not possibly have drawn the appropriate inferences from the evidence adduced at trial to find the requisite guilt. *State v. Poellinger*, 153 Wis. 2d 493, 507, 451 N.W.2d 752 (1990). We review the evidence in the light most favorable to the verdict. *Id.* at 504. The credibility of witnesses and the weight of the evidence are for the trier of fact. *Id.* A criminal conviction can be based in whole or in part upon circumstantial evidence. *State v. Pankow*, 144 Wis. 2d 23, 30, 422 N.W.2d 913 (Ct. App. 1988). Our standard of review is the same whether the evidence is direct or circumstantial. *Poellinger*, 153 Wis. 2d at 503.

¶ 21. The evidence here was more than sufficient to support the verdicts. The State presented numerous witnesses who described the chain of events from the robbery through apprehension of the suspects. The witnesses described the robbers' attire and weapons, the bank's metal cash box, and the escape vehicle and license plate number. Police testified to following the described vehicle until it crashed and finding inside it a metal cash box and bank-identified cash. Two police

517

department latent print examiners testified that a partial fingerprint lifted from Duke's car matched Rashaad's. When asked at trial if he was certain it was Rashaad who had "carjacked" him, Dukes testified he was "[one hundred] percent positive. [Two hundred]." The evidence in this case amply supports the verdicts.

*By the Court.*—Judgment reversed and cause remanded.