In re the Termination of Parental Rights to Sophia S., a person under the age of 18:

Dane County Department of Human Services, Petitioner-Respondent,

v.

Susan P. S., Respondent-Appellant.†
[No. 2005AP3155]

In re the Termination of Parental Rights to Isaiah A.S., a person under the age of 18:

Dane County Department of Human Services, Petitioner-Respondent,

v.

Susan P. S., Respondent-Appellant.†
[No. 2005AP3156]

In re the Termination of Parental Rights to Nathanial A.S., a person under the age of 18:

Dane County Department of Human Services, Petitioner-Respondent,

v.

Susan P. S., Respondent-Appellant.†
[No. 2005AP3157]

In re the Termination of Parental Rights to Elijah S., a person under the age of 18:

† Petition to review filed.

DANE COUNTY DEPARTMENT OF HUMAN SERVICES,
Petitioner-Respondent,

v.

SUSAN P. S., Respondent-Appellant.†
[No. 2005AP3158]

Court of Appeals

*Nos. 2005AP3155, 2005AP3156, 2005AP3157, 2005AP3158.
Submitted on briefs March 3, 2006.—Decided April 26, 2006.*

2006 WI App 100

(Also reported in 715 N.W.2d 692.)

† Petition to review denied 9-11-06.

On behalf of the respondent-appellant, the cause was submitted on the briefs of *William E. Schmaal*, assistant state public defender of Madison.

On behalf of the petitioner-respondent, the cause was submitted on the brief of *Maureen A. Plunkett*, Dane County assistant corporation counsel, Madison.

A guardian ad litem brief was filed by *Richard J. Auerbach* of *Auerbach & Porter*, Madison.

Before Lundsten, P.J., Dykman and Vergeront, JJ.[1]

¶ 1. LUNDSTEN, P.J. This is a termination of parental rights (TPR) case. Susan P.S. appeals orders of the circuit court terminating her parental rights to four of her children.

¶ 2. Susan was initially represented by appointed counsel, but she later requested and was granted permission to represent herself. Still later, on the second day of a TPR fact-finding hearing held before a jury, the circuit court found that Susan was no longer competent to represent herself, rescinded her self-representation, and directed her standby counsel to step in. Susan argues that her right to self-representation was violated when the court rescinded her self-representation. In addition, Susan argues that her right to self-representation was violated when a motion hearing was begun in her absence, at a time she was representing herself. We reject both of these arguments, but agree with Susan's threshold proposition that the applicable

---

[1] This case was converted from a one-judge appeal to a three-judge appeal pursuant to WIS. STAT. § 809.41(3) (2003–04). All references to the Wisconsin Statutes are to the 2003–04 version unless otherwise noted.

self-representation competency standards are those developed in a line of criminal cases beginning with *Pickens v. State*, 96 Wis. 2d 549, 568–70, 292 N.W.2d 601 (1980), *overruled in part, but affirmed as to the standard of competency, State v. Klessig*, 211 Wis. 2d 194, 206, 564 N.W.2d 716 (1997).

¶ 3. Susan also argues that the circuit court lost competency over the action when it exceeded a mandatory time limit applicable to TPR dispositional hearings without compliance with Wis. Stat. § 48.315. We reject this argument because we conclude that the circuit court complied with § 48.315.

¶ 4. Accordingly, we affirm the circuit court.

### *Background*

¶ 5. Susan and her co-respondent, Todd S., are the parents of five children. On November 1, 2004, Dane County filed petitions for the termination of parental rights with respect to both parents and four of the children, Sophia S., Isaiah A.S., Nathanial A.S., and Elijah S. The petitions alleged, among other things, that Susan was unable to maintain a stable residence and source of income and was unable to manage her mental health problems, which had an ongoing negative effect on her children. Both Susan and Todd were provided appointed counsel.

¶ 6. On March 7, 2005, Susan's counsel filed a motion to withdraw, explaining that Susan wanted to represent herself. At a hearing on that motion, Susan waived her right to appointed counsel and was found competent to represent herself. However, because the circuit court remained concerned about Susan's competency, it ordered that the state public defender appoint an attorney to act as standby counsel.

¶ 7. Susan's and Todd's cases remained joined. Susan represented herself from April 1, 2005, until the second day of the fact-finding hearing, June 21, 2005. On the morning of the second day, over Susan's objection, the circuit court found that Susan was no longer competent to represent herself and directed standby counsel to take over representation. At the end of the hearing, the jury found that Susan had failed to meet the conditions established for the safe return of her children and there was a substantial likelihood she would be unable to do so within twelve months. The jury also found grounds for termination with respect to Todd.

¶ 8. Susan's and Todd's dispositional hearing was held on August 26, 2005, fifty-eight days after the conclusion of the fact-finding hearing, a date thirteen days beyond the forty-five-day time limit imposed by Wis. Stat. § 48.424(4). At the dispositional hearing, the circuit court terminated both Susan's and Todd's parental rights to all four children. Susan appeals those final orders.

### *Discussion*

### *I. Whether Susan Was Erroneously Denied Her Right To Self-Representation*

### *A. Self-Representation Competency Standards*

### *1. Self-representation competency standards developed for criminal defendants apply to parents in termination of parental rights actions*

██

¶ 9. As a threshold matter, we must decide whether the self-representation competency standards developed in a line of criminal cases beginning with

*Pickens* should apply to parents in TPR actions. All parties to this appeal agree that the same standards should apply. This agreement is well founded.

¶ 10. In criminal and TPR actions, defendants and parents have the right to counsel.[2] Likewise, in criminal and TPR actions, defendants and parents have the right to self-representation. For criminal defendants, the right to self-representation is protected by the Sixth Amendment to the United States Constitution and article I, section 7 of the Wisconsin Constitution. *Klessig*, 211 Wis. 2d at 203. For parents in TPR actions, the right to self-representation is guaranteed both by statute and the Wisconsin Constitution.

¶ 11. The statutory right is found in WIS. STAT. § 48.23(2), which provides, in part: "If a proceeding involves . . . the involuntary termination of parental rights, any parent 18 years old or older who appears before the court shall be represented by counsel; but the parent may waive counsel provided the court is satisfied such waiver is knowingly and voluntarily made." Since the legislature has provided that a parent may waive counsel, it follows that the party has a statutory right to self-representation.

---

[2] Criminal defendants in Wisconsin are guaranteed the right to the assistance of counsel by article I, section 7 of the Wisconsin Constitution and the Sixth Amendment to the United States Constitution. *State v. Klessig*, 211 Wis. 2d 194, 201–02, 564 N.W.2d 716 (1997). Regardless whether parents in a TPR action have a constitutional right to counsel, *see Lassiter v. Department of Social Services*, 452 U.S. 18, 31–33 (1981) (the United States Constitution does not provide parents with a right to representation in all TPR actions, but instead the right must be assessed on a case-by-case basis), Wisconsin gives parents a statutory right to the assistance of counsel. *See* WIS. STAT. § 48.23(2).

¶ 12. The state constitutional right to self-representation is found in article I, section 21(2) of the Wisconsin Constitution, which provides: "In any court of this state, any suitor may prosecute or defend his suit either in his own proper person or by an attorney of the suitor's choice." The court in *S.Y. v. Eau Claire County*, 162 Wis. 2d 320, 323–24, 469 N.W.2d 836 (1991), addressed whether a person subject to involuntary commitment proceedings under Chapter 51 had the right to self-representation. After concluding that a respondent in a civil commitment proceeding was a "suitor" within the meaning of article I, section 21(2) of the Wisconsin Constitution, *S.Y.*, 162 Wis. 2d at 329, the court broadly held: "Article I, sec. 21(2), Wis. Const., affords the right of any person to self-representation . . . ." *Id.* at 330. This holding plainly applies to parents in TPR actions.

██

¶ 13. Thus, parents in TPR actions, like defendants in criminal actions, have both the right to the assistance of counsel and the right to self-representation.

¶ 14. Perhaps more important than the source of these rights is the fact that the interests of the affected parties are strikingly similar in both criminal and TPR actions. In both, the need for an accurate and fair result may supersede an individual's right to self-representation. In the criminal context, our supreme court has explained: "Neither the state, nor the defendant, is in any sense served when a wrongful conviction is easily obtained as a result of an incompetent defendant's attempt to defend himself." *Pickens*, 96 Wis. 2d at 568. We find similar statements in TPR cases. In *M.W. v. Monroe County Department of Human Services*, 116 Wis. 2d 432, 342 N.W.2d 410 (1984), *modified in part on other grounds by Steven V. v. Kelley H.*, 2004 WI 47, 271 Wis. 2d 1, 678 N.W.2d 856, the court observed that

the state's power to terminate a parental relationship is "an awesome one, which can only be exercised under proved facts and procedures which assure that the power is justly exercised." *M.W.*, 116 Wis. 2d at 436. In *Lassiter v. Department of Social Services*, 452 U.S. 18 (1981), a TPR case addressing a parent's right to counsel, the United States Supreme Court observed:

> If, as our adversary system presupposes, accurate and just results are most likely to be obtained through the equal contest of opposed interests, the State's interest in the child's welfare may perhaps best be served by a hearing in which both the parent and the State acting for the child are represented by counsel, without whom the contest of interests may become unwholesomely unequal.

*Id.* at 28.

¶ 15. Finally, we note that our supreme court has already extended the *Pickens* standards for waiver of counsel and self-representation competency to at least one non-criminal action. In *S.Y.*, the court applied *Pickens* to a person who desired to represent himself in a Chapter 51 involuntary commitment proceeding. *S.Y.*, 162 Wis. 2d at 334–37.

¶ 16. Because it is consistent with all of the authority we find on the topic, and because we discern no reason not to, we adopt the view of the parties to this appeal that the self-representation competency standards developed in a line of criminal cases beginning with *Pickens* apply to parents in TPR actions. Having reached that conclusion, we next summarize the standards.

### 2. Summary of self-representation competency standards

¶ 17. The applicable general framework is well established:

"When a defendant seeks to proceed pro se, the circuit court must insure that the defendant (1) has knowingly, intelligently and voluntarily waived the right to counsel, and (2) is competent to proceed pro se." If these conditions are not satisfied, the trial court must prevent the defendant from self-representation because to do otherwise would deny the defendant the constitutional right to counsel. If these conditions are satisfied, the trial court must allow the defendant to represent himself or herself, because to do otherwise would deny the defendant the constitutional right to self-representation.

*State v. Ruszkiewicz*, 2000 WI App 125, ¶ 26, 237 Wis. 2d 441, 613 N.W.2d 893 (citations omitted); *see also State v. Marquardt*, 2005 WI 157, ¶ 56, 286 Wis. 2d 204, 705 N.W.2d 878.

█

¶ 18. The determination of self-representation competency requires an assessment of whether a person is able to provide himself or herself with "meaningful" self-representation. *See Marquardt*, 286 Wis. 2d 204, ¶¶ 61, 68–69. In making this assessment, courts must distinguish technical legal knowledge—something that is not required—from the practical ability to make arguments, present evidence, and ask effective questions. *See Marquardt*, 286 Wis. 2d 204, ¶ 60; *Klessig*, 211 Wis. 2d at 212; *Pickens*, 96 Wis. 2d at 568–69.

¶ 19. Collectively, published cases have identified the following self-representation competency considerations: education, literacy, fluency in English, the ability to communicate effectively, the complexity of the case, the ability to put the other side to its burden of proof, the ability to understand what is necessary to present a defense, experience in the legal system, a person's actual handling of the case, whether the person is unruly or unmanageable, physical disabilities, psy-

chological disabilities, mental illness, and the opinion of medical and psychological experts regarding self-representation competency if the opinions identify relevant and specific problems. *Marquardt*, 286 Wis. 2d 204, ¶¶ 60–66; *Klessig*, 211 Wis. 2d at 212–13; *Pickens*, 96 Wis. 2d at 568–71; *Ruszkiewicz*, 237 Wis. 2d 441, ¶¶ 35, 39–40. This listing is not exclusive; courts may consider other factors if they have an effect on meaningful self-representation. *See Marquardt*, 286 Wis. 2d 204, ¶ 61 (considerations are not limited to those identified in *Pickens*). The key issue is whether the record shows "an identifiable problem or disability that may prevent" meaningful self-representation. *Marquardt*, 286 Wis. 2d 204, ¶ 61.

■■■

¶ 20. A lack of technical legal knowledge does not disqualify a person from self-representation. *See Pickens*, 96 Wis. 2d at 568.[3] Similarly, a person's "unusual conduct or beliefs" or a mental illness does not, by itself,

---

[3] Although *Pickens v. State*, 96 Wis. 2d 549, 292 N.W.2d 601 (1980), *overruled in part, but affirmed as to the standard of competency, State v. Klessig*, 211 Wis. 2d 194, 206, 564 N.W.2d 716 (1997), states that legal skills are "irrelevant," that holding is difficult to reconcile with the general test that seemingly permits consideration of all relevant factors. If a person possesses pertinent legal skills, why should that fact not weigh in favor of finding the person competent for purposes of self-representation? Why should it be irrelevant? The *Pickens* court itself went on to consider the defendant's legal skills and weighed that skill in favor of upholding the circuit court's competency finding. *See Pickens*, 96 Wis. 2d at 571 ("And, in addition to the basic substantive defense of consent, the defendant's handling of the case also reveals his awareness of the more technical defense of lack of venue. He knew that if the crime occurred in Illinois, rather than Walworth county, he would have a complete defense. Accordingly, he attempted to

necessarily establish incompetence for purposes of self-representation. *See Ruszkiewicz*, 237 Wis. 2d 441, ¶ 43; *S.Y.*, 162 Wis. 2d at 337 & n.8.

¶ 21. A court's self-representation competency determination is frequently not a one-time decision. If a court grants a person's request for self-representation, the court has a continuing responsibility to insure that the person's "incompetence is not allowed to substitute for the obligation of the [opposing side] to prove its case." *Pickens*, 96 Wis. 2d at 569. If, during the course of the proceedings, it becomes apparent that a person is incompetent for purposes of self-representation, a court should rescind the right and assign counsel. *Id.*

¶ 22. Our standard of review gives "deference to the judgment, experience and better position of the trial judge." *Ruszkiewicz*, 237 Wis. 2d 441, ¶45. Speaking in its criminal context, the *Pickens* court explained:

> [T]he question of whether a defendant is capable of self-representation *is uniquely a question for the trial*

---

prove that the location of the crime, as described by the complainant, was in Illinois."); *see also S.Y. v. Eau Claire County*, 162 Wis. 2d 320, 338, 469 N.W.2d 836 (1991) (in affirming a circuit court decision to permit a person subject to a Chapter 51 involuntary commitment proceeding to proceed *pro se*, the supreme court noted that the person carried out his defense with "near professional skill," including a prompt, timely, well-stated, and correct hearsay objection). We also note that a circuit court's reliance on a person's lack of legal skills when denying self-representation does not require reversal if the lack of legal skills was "not the sole basis for the circuit court's determination." *State v. Marquardt*, 2005 WI 157, ¶ 62, 286 Wis. 2d 204, 705 N.W.2d 878. In sum, we understand *Pickens* to be saying that a lack of legal skills, by itself, does not disqualify a person, but if a person has pertinent legal skills, that fact may weigh in favor of competency.

*court to determine.* It is the trial judge who is in the best position to observe the defendant, his conduct and his demeanor and to evaluate his ability to present at least a meaningful defense.

. . . .

We realize, of course, that the determination which the trial court is required to make must necessarily rest to a large extent upon the judgment and experience of the trial judge and his own observation of the defendant. For this reason, the trial court *must be given sufficient latitude to exercise its discretion* in such a way as to insure that substantial justice will result. On review, therefore, its determination that the defendant is or is not competent to represent himself *will be upheld unless totally unsupported by the facts apparent in the record.*

*Pickens*, 96 Wis. 2d at 568–70 (emphasis added); *see also Ruszkiewicz*, 237 Wis. 2d 441, ¶ 38.

██

¶ 23. If the circuit court fails to identify a sufficient reason for denying self-representation, the question on appeal is whether the record demonstrates "an identifiable problem or disability that may prevent a defendant from making a meaningful defense." *Marquardt*, 286 Wis. 2d 204, ¶ 61; *see also id.,* ¶ 68 ("We do not share Marquardt's view that the circuit court must always make an express finding as to which specific problem or disability prevented a defendant from being able to meaningfully represent himself."); *Klessig*, 211 Wis. 2d at 213–14 (acknowledging its authority to affirm a circuit court decision to let a defendant proceed *pro se,* even though the circuit court did not "independently consider the defendant's competence to repre-

sent himself," but then choosing to remand for a determination of that issue by the circuit court).

*B. Application Of Competency Standards To The Circuit Court's Decision To Rescind Susan's Self-Representation During The Fact-Finding Hearing*

¶ 24. About eleven weeks prior to her fact-finding hearing, the circuit court heard and granted Susan's request to represent herself. Susan validly waived her right to counsel and the court found she was competent to represent herself. Susan challenges neither her waiver nor the ruling finding her competent. To the contrary, Susan contends that the circuit court erred when it rescinded self-representation and directed Susan's standby counsel to take over representation on the morning of the second day of the fact-finding hearing. Susan makes the following arguments:

1. The record does not support the circuit court's decision to rescind Susan's self-representation.

2. The circuit court applied an erroneous legal standard when it considered Susan's technical legal skills.

3. The circuit court applied an erroneous legal standard when it considered Susan's courtroom demeanor and tone of voice.

4. Susan's due process rights were violated when the circuit court based its decision to rescind self-representation in part on "damaging allegations" made during Susan's absence at a motion hearing about five weeks prior to the fact-finding hearing.

5. The circuit court's rescission decision involved improperly resolving a dispute between Susan and her standby counsel in favor of the standby counsel.

We address and reject each of these arguments.

*1. The record supports the finding that Susan was not competent to represent herself*

¶ 25. Susan asserts that the record is "manifestly insufficient" to support a factual finding that she was incompetent under the test for self-representation competency established in *Pickens, Klessig,* and *Ruszkiewicz.* We disagree. In our view, the record easily supports the circuit court's decision to rescind self-representation.

¶ 26. From the time Susan began self-representation, through the end of the first day of the fact-finding hearing, her self-representation was problematic. We could detail, for example, the circuit court's awareness of Susan's persistent and unreasonable failure to cooperate with discovery. But it is apparent that the court's decision to rescind self-representation was not based on Susan's overall performance, but instead on her bipolar disorder and its effect on her performance in the presence of her jury at her fact-finding hearing. Thus, we focus our attention both on facts relating to her disorder and on the fact-finding hearing.

¶ 27. Undisputed evidence, presented prior to the fact-finding hearing and during the hearing, but prior to the court's decision to rescind self-representation, showed that Susan has bipolar disorder, a serious mental health disorder formerly referred to as "manic depressive disorder." Symptoms of the disorder include mood fluctuation from depression to manic phases. In a manic phase, persons exhibit very rapid speech, a tendency to be distracted, an inflated sense of self-esteem, unreasonable expectations about what they are

able to accomplish, delusions, disorganization, a high level of irritability, and hostility, including engaging in conflicts with strangers. As we shall see, Susan exhibited most of these symptoms at her fact-finding hearing.

¶ 28. Susan's condition resulted in hospitalization at least fourteen times between the ages of sixteen and forty, when this TPR action commenced. The most common form of treatment for bipolar disorder is medication. Susan declined prescribed medications during all times relevant here. She expressed the belief that she could cure herself with proper nutrition.

¶ 29. On the first day of the fact-finding hearing, Susan's performance was sometimes minimally competent. But, more often, her behavior was self-defeating. During voir dire, Susan asked many questions that either had no meaningful connection to the factual issues her jury would be asked to decide or were phrased so generally as to be useless.

¶ 30. We will not here devote the space necessary to fully describe the many exchanges between Susan and the prospective jurors during voir dire that went beyond being unhelpful to being borderline bizarre. One example will suffice. When Susan was told or realized that she had two minutes left to question jurors, the following ensued:

> [Susan]: I believe I have two minutes, your Honor. Okay. Two-minute warning. Anybody understand football? Maybe we can score a touchdown. What do you think about children, what has been your experience with children? What is your experience with families? What do you think about families and what do you think about the Ten Commandments? Should they be posted in the courtroom, yes or no?

THE COURT: Let's stick with the family questions.

[Susan]: The belief system – belief system is not on trial here, it is a family issue. Just, your Honor –

THE COURT: We are not going into the Ten Commandments.

[Susan]: Just if they should be posted in the courtroom or not.

THE COURT: No.

[Susan]: Well, that would really help me in my decision.

¶ 31. Susan's opening statement was less effective than her voir dire. She began by starting to read verbatim WIS. STAT. § 48.01(1), a very lengthy subsection. After a short time, the court stopped Susan and suggested she talk to the jury about what she believed the evidence would show. When Susan responded by arguing that she should be permitted to continue reading the statute, the court held a bench conference. The court explained to Susan that most of § 48.01(1) was not relevant and that she should focus on the subject of the hearing, namely, her ability to meet the conditions for the return of her children and what the evidence would show on that topic. Susan said she wanted to argue to the jury that her initial TPR hearing did not occur within the legally required time period. The court patiently explained that the timeliness of the prior hearing was not an issue for the jury, and again attempted to help Susan focus on factual questions the jury would decide.

¶ 32. When Susan resumed her opening statement, she talked about her life, starting with her birth.

Although it might have been a reasonable strategy for Susan to give the jury a brief summary of her background, Susan unreasonably spent much of her time on inconsequential details of her life. Susan told the jury she began weekly allergy shots at the age of five, related details of her participation in the Brownies, gave a play-by-play account of the highlight of her basketball career when she sunk a last second game-winning shot, and listed her scheduled hours at three service-sector jobs she had when she took a break from college.

¶ 33. Together, the other advocates gave opening statements covering about twenty minutes. After Susan had talked for approximately one hour, she had covered about half her lifetime and did not appear close to addressing her recent history or her ability to meet the conditions for the return of her children. The court told Susan it was time to stop, but that she would be allowed to continue talking about her life when she testified.

¶ 34. The County called the first witness, a psychologist named Sandra Eugster who had met with Susan twice. Eugster testified that it was her opinion that Susan suffered from bipolar disorder and that being in a manic phase was Susan's most common state. Eugster recounted reported examples of Susan's behavior, including a time when Susan tried to stop cars in the street and get into the cars and a time when she tried to get on an airplane by stopping people in an airport terminal and asking them for money for a ticket.

¶ 35. Susan began her cross-examination of the psychologist by asking her to repeat her name and spell it, something the psychologist had done at the beginning of her testimony. Susan told the psychologist her name was not pronounced like it was spelled, but instead sounded like oyster. Susan herself then spelled

the psychologist's name. When Susan began asking actual questions, they were vague, such as how many "tiers of family are present [in farm communities]."

¶ 36. After Susan cross-examined the psychologist for a short time, something less than ten minutes, the court excused the jury for the day. The court then advised Susan that she needed to ask questions that had something to do with the issues being tried. When the county attorney asked the court to place a time limit on Susan's cross-examination, Susan interrupted, saying: "A filibuster on opening statements could last all week." After an exchange between Susan and the court that included Susan requesting eighty more minutes of cross-examination, the court ruled that Susan could have an additional fifty minutes the following morning.

¶ 37. The next day, Susan's behavior and performance declined markedly. She began by asking the court if her standby counsel could sit in the back of the courtroom so that he could have a different visual perspective of the testifying witness. Susan's logic was that standby counsel could observe aspects of the witness's body language from that distance that "you maybe can't see close up." The court denied the request, explaining that standby counsel was not there to assess the body language of witnesses. Susan failed to understand or refused to accept this explanation and continued to argue the issue.

¶ 38. Although the day before Susan appeared to have several more questions for the psychologist and requested eighty more minutes for her cross-examination, her continued examination the second day lasted just a couple of minutes. Susan showed the psychologist pamphlets she had brought to court, including one entitled "Speaking Out for Yourself." Rather

than summarize, we let the record speak for itself. The entirety of her continued cross-examination follows:

Q [by Susan] Are you well aware, Ms. Eugster, that you're in a court of law?

A Yes.

Q Ms. Eugster, these are exhibits, Ms. Eugster. Are you well aware that these are exhibits, Ms. Eugster?

. . . .

A I understand that these are exhibits.

Q "Speaking Out for Yourself" – "Speaking Out for Yourself" – "Speaking Out for Yourself" –

 [guardian ad litem]: Your Honor, may we approach?

 [Susan]: No further questions, Your Honor.

 [guardian ad litem]: I'd withdraw that.

¶ 39. The county's attorney asked the psychologist one redirect question, and the court asked Susan if she had any follow-up questions. Susan responded: "Yes, Your Honor, I have follow-up that could last a lifetime." Susan proceeded to ask futile questions until the court interrupted and ordered a recess. Susan apparently believed that the court was about to criticize her for her behavior. She told the court she believed it would be "directing" her, and asked that the jury be allowed to watch. Susan, who had repeatedly failed to follow the court's directive that she remain seated, was again told to be seated, and she responded: "I would like to stand for the thrashing."

¶ 40. The court informed Susan that there would be no thrashing but that it was concerned that her

demeanor had changed significantly from the previous day. Susan's explanation was that "when you're a lawyer, you're on stage," and she was using a "courtroom voice," like Perry Mason. She requested the privilege "like any other lawyer has to use the stage." Susan argued that she should be allowed to continue, saying that it was the bailiff's purpose to remove people who are "out of order," and "he probably would love to exercise his purpose that he's been waiting all his life to do."

¶ 41. The court stated that Susan's appearance was different this day. According to the court, Susan had previously dressed professionally in a suit and had her hair up, but on this day was wearing sneakers and a polo shirt with her hair down. The court stated that Susan alternated between speaking "in an audible voice and muttering in an inaudible voice." The guardian ad litem informed the court that, prior to going on the record, Susan had been singing and talking in "an extremely animated voice." The county attorney observed that Susan's few questions to the psychologist were "stated in a very loud and . . . verging on threatening tone of voice." The circuit court plainly agreed with that assessment, adding that Susan's body language was also aggressive in that she was aggressively walking around when questioning the psychologist.

¶ 42. At this point, the court instructed Susan that she needed to ask questions from counsel table and needed to use a normal tone of voice. Susan argued that she should have fifty more minutes of re-cross-examination because the court had, the day before, promised her fifty more minutes. When the court explained that Susan had already passed up her chance to ask questions on cross-examination, Susan responded with a non sequitur: although she could

question the psychologist "for a lifetime," she had done it in "five seconds." Following exchanges during which Susan repeatedly interrupted, the court said: "I can't get a word in edgewise here so I don't know how we're going to be able to continue with [you] representing yourself. I have told you one of the rules is not to interrupt and you just interrupted me about ten times in a row."

¶ 43. We acknowledge that our sampling of Susan's behavior on the first day of the fact-finding hearing does not include some instances in which her performance was competent. We agree with Susan, as did the circuit court, that she is educated and literate. And, much in the record indicates she had a basic understanding of the proceedings. But her performance even the first day was, at best, barely competent. On the second day, Susan showed she was incapable of putting the County to its burden of proof. Her questions and arguments were nonsensical. Her behavior was erratic and unruly.

¶ 44. We give deference to the circuit court because it was there to observe Susan's "demeanor and to evaluate [her] ability to present at least a meaningful defense." *Pickens*, 96 Wis. 2d at 568. Far from being "totally unsupported by the facts apparent in the record," *id.* at 570, the record here easily supports the circuit court's decision to rescind Susan's self-representation on the second day of the fact-finding hearing.

*2. Consideration of Susan's legal skills*

¶ 45. Susan points to particular statements made by the circuit court and argues that they show that the court improperly considered Susan's lack of legal skills.

303

She seems to assert that the court was commenting on her inability to ask questions in proper legal form. We disagree. Instead, the comments plainly reflect the court's view that Susan was failing to ask pertinent questions:

> I am concerned about your inability so far to frame a question that has much of anything to do with the direct testimony. In the long-run, if you can't ask appropriate cross-examination questions, you are not going to be able to represent yourself in this matter.
>
> I am also concerned that if [Susan] isn't capable of doing an adequate job of cross-examination, that she is no longer competent to represent herself and her rights are not being respected by allowing her to try and fail to do so.
>
> Well, it's clear that this morning [Susan] is unable to follow the expectations of the court, ask relevant cross-examination questions, and that she is not – that this witness is an important witness against her, and that by failing to cross-examine her at all, that her case is being harmed. So I do find that [Susan] is not competent at this time to continue to represent herself.

Accordingly, we reject the argument that the circuit court improperly considered Susan's lack of legal skills.

*3. Consideration of Susan's demeanor and tone of voice*

¶ 46. Susan argues that the circuit court erred as a matter of law when it considered her courtroom demeanor and tone of voice. According to Susan, her conduct "clearly did not rise to the level of such 'manipulative or disruptive' behavior that could forfeit her right of self-representation by operation of law." Rather, according to Susan, she explained to the circuit court that she had just been trying to use "a courtroom voice

like Perry Mason" so the jurors would not "fall asleep." Susan, however, does not support this argument with relevant legal authority.[4] Moreover, a person's demeanor and tone of voice are proper considerations when assessing self-representation competency. *See Ruszkiewicz*, 237 Wis. 2d 441, ¶ 39; *Pickens*, 96 Wis. 2d at 568. And, the circuit court here was "in the best position to observe" Susan's conduct and demeanor. *See Pickens*, 96 Wis. 2d at 568–70. We will not second-guess the circuit court's assessment that Susan's courtroom demeanor and tone of voice were inappropriately aggressive.

### 4. Consideration of allegations made at a prior hearing during Susan's absence

¶ 47. Susan argues that parents in a TPR action have a due process right to be heard at a meaningful time and in a meaningful manner. She contends that this right was violated and, consequently, her right to self-representation was violated, when the circuit court based its decision to rescind self-representation, in part, on "damaging allegations" made during Susan's absence at a motion hearing held about five weeks prior to the fact-finding hearing. In Susan's view, because she was not present when the allegations were made, she did not have a meaningful and timely opportunity to respond to them. We are not persuaded.

---

[4] Susan's legal support consists of an unexplained "*cf.*" citation to *State v. Cummings*, 199 Wis. 2d 721, 546 N.W.2d 406 (1996). The portion of *Cummings* Susan relies on addresses whether a defendant who refused to waive counsel was properly deemed to have waived counsel and was required to represent himself. *Id.* at 751–52. Thus, the defendant in *Cummings* was not denied the right to self-representation because of misbehavior. To the contrary, he did represent himself.

¶ 48. We agree that parents in a TPR action have a due process right to be heard at a meaningful time and in a meaningful manner. *See Brown County v. Shannon R.*, 2005 WI 160, ¶ 64, 286 Wis. 2d 278, 706 N.W.2d 269. And we assume, without deciding, that if the circuit court's decision to rescind Susan's self-representation was based in part on information or opinions that Susan did not have a meaningful opportunity to respond to, then the rescission of Susan's self-representation would be error. But our review of the "allegations," in the context of the record up to the time the court rescinded self-representation, convinces us that they had no effect on the circuit court's decision.

¶ 49. When Susan did not appear on time for the May 13, 2005 motion hearing, the circuit court went on the record and learned that Susan likely had no good reason for being late. The court expressed concern that Susan's absence was an indication that she was no longer competent to represent herself. What followed were the three "allegations" Susan complains about on appeal: (1) the county attorney gave her opinion that Susan had a "pattern" of doing anything she could think of to "delay or interfere with the process"; (2) the guardian ad litem said he had "ongoing concerns" regarding Susan's "overall competency to represent herself"; and (3) Todd, the children's father and Susan's co-respondent, gave his opinion that, regardless whether Susan began to cooperate by taking her "meds," she was not capable of "watching anybody's kids."

¶ 50. The county attorney and the guardian ad litem did not allege particular facts; they simply offered explanations, apparently based on information, or the type of information, the circuit court was already privy to. Likewise, Todd did not make specific factual asser-

tions, but merely gave an opinion about Susan's parenting abilities. In this instance, the opinion came from a person with a personal stake in the outcome of the proceeding. It is simply not plausible that these opinions had any effect on the court's decision, five weeks later, to rescind Susan's self-representation when that decision was so obviously based on the court's direct observation of Susan's behavior during the fact-finding hearing.

¶ 51. We conclude that the record does not support Susan's factual assumption that the circuit court's rescission decision was affected by the three "allegations" made at the May 13 hearing. Therefore, we need not address whether Susan was entitled to a meaningful opportunity to respond to those allegations or whether she was denied that opportunity.[5]

### 5. The dispute between Susan and her standby counsel regarding Susan's competency

¶ 52. Susan argues that the circuit court's decision rescinding self-representation was improperly based on resolving a dispute between Susan and her standby counsel in favor of the standby counsel. This argument has two components: first, under *McKaskle v. Wiggins*, 465 U.S. 168 (1984), a court may not resolve a dispute between a *pro se* party and the party's standby

---

[5] On this topic, we make two observations. First, due process is a flexible concept that defies precise definition. *Lassiter,* 452 U.S. at 24–25. Its application is an "uncertain enterprise" that depends on the "particular situation." *Id.* Second, in general, TPR proceedings deserve "heightened" due process protection because they implicate interests of the parents, children, and the State that are "extremely important," and the "State has no interest in depriving a parent of the right to be heard" in a meaningful way in a TPR proceeding. *See Brown County v. Shannon R.*, 2005 WI 160, ¶¶ 59, 67, 286 Wis. 2d 278, 706 N.W.2d 269.

counsel in favor of the standby counsel and, second, the circuit court here violated *McKaskle* by resolving a dispute between Susan and her standby counsel over Susan's ability to represent herself in favor of standby counsel. This two-part argument fails because it hinges on applying a sentence from *McKaskle* to a context the *McKaskle* Court plainly did not intend it to cover.

¶ 53. Susan quotes the following from *McKaskle*:

> [Self-representation] rights are adequately vindicated in proceedings outside the presence of the jury if the pro se defendant is allowed to address the court freely on his own behalf and if disagreements between [standby] counsel and the pro se defendant are resolved in the defendant's favor whenever the matter is one that would normally be left to the discretion of counsel.

*Id.* at 179. Here, obviously, the *McKaskle* Court is speaking about the need to let *pro se* defendants make their own strategic decisions. The Court explained: "If standby counsel's participation over the defendant's objection effectively allows counsel to make or substantially interfere with any significant tactical decisions, or to control the questioning of witnesses, or to speak instead of the defendant on any matter of importance, the [right to self-representation] is eroded." *Id.* at 178. Thus, *McKaskle* addresses the relationship between standby counsel and a litigant *engaged* in self-representation. It says nothing about whether standby counsel may offer an opinion about the competence of a *pro se* litigant.[6]

---

[6] In the midst of her standby-counsel-dispute argument, Susan asserts that the action of her standby counsel in giving his opinion on her competency, by itself, violated her right to self-representation. But Susan provides no legal support for this proposition, and her reasoning is not apparent. If Susan had

¶ 54. In sum, we reject each argument Susan makes challenging the circuit court's decisions to rescind self-representation and to direct her standby counsel to take over representation.

### C. Whether Susan's Right To Self-Representation Was Erroneously Denied At A Motion Hearing

¶ 55. Susan argues that she was erroneously denied her right to self-representation at a May 13, 2005 motion hearing held about five weeks prior to the fact-finding hearing. Susan argues that her right to self-representation was denied at this hearing because the circuit court commenced the hearing about thirty-three minutes before she appeared and, at the time, she was representing herself.[7] We conclude that Susan has not

been permitted to continue with self-representation, it could not be said that she was denied her right to self-representation, regardless what her standby counsel said about her competence outside the presence of the jury. A court may not delegate the assessment of a person's self-representation competency to standby counsel, but Susan does not argue that such occurred here. And, this is not an instance in which standby counsel offered information that the court did not already possess. We are aware of no legal or logical support for the proposition that the right to self-representation is denied by the mere act of standby counsel opining that a *pro se* litigant is incompetent. Notably, *McKaskle v. Wiggins*, 465 U.S. 168 (1984), the very case Susan relies on for her standby-counsel-dispute argument, presents an example of standby attorneys who often vigorously disagreed, outside the presence of the jury, with the *pro se* defendant they were assigned to assist, yet such disputes did not deprive the defendant of his right to self-representation. *Id.* at 179–81.

[7] Susan actually argues that this time period was forty-eight minutes, but the record shows that the hearing began at 11:15 a.m. and that Susan appeared at 11:48 a.m.

demonstrated that her right to self-representation was denied at the motion hearing. Before addressing Susan's specific argument, we provide a brief factual summary.

¶ 56. The hearing was prompted by the County's motion to compel Susan to cooperate with discovery, including production of Susan's mental health records. It was scheduled for 11:00 a.m. Susan failed to appear, and the court commenced the hearing at 11:15 a.m. The court began by indicating that Susan had telephoned to say she was going to be late. The court was informed by Todd that he had driven to Susan's residence to give her a ride to the hearing, but Susan was not ready. Todd told the court he waited for a time, but then, after giving Susan another chance, left without her so that he would not be late. Other matters were discussed, most prominently whether the court could address the County's motion in Susan's absence and whether Susan's absence was an indication that she was no longer competent to represent herself. A short time before Susan arrived, the court determined that it could proceed to address the County's motion. The court reached this conclusion after agreeing with the guardian ad litem that the hearing was properly noticed and scheduled, that Susan knew from a prior order that her failure to attend a proceeding could lead to a default judgment against her, that the court could rule in favor of the County based on Susan's failure to appear, and that proceeding with a discussion of the merits of the County's motion was less detrimental to Susan than ruling in favor of the County based on Susan's failure to appear.

¶ 57. For the next few minutes, little occurred.[8] Susan's standby counsel told the court what he knew

_____

[8] We are confident that only a few minutes passed because of the content of the five pages of transcript covering this time period.

about Susan's position regarding discovery. The county attorney then began summarizing arguments the attorney made in a letter brief, delivered to the parties, including Susan, the day before. When Susan arrived, she confirmed that she was late because she was "not ready in time." Prior to Susan's arrival, the court made no decisions, apart from the decision to proceed. After Susan arrived, the county attorney continued with a summary of her written argument. The guardian ad litem gave his opinion on the main topic, that is, the court's authority to order Susan's mental health providers to disclose Susan's records. The county attorney then refined her request based on her agreement with the guardian ad litem's analysis. The court then asked Susan to state her position, and Susan responded:

> Well, your Honor, I want to make the strongest case possible for the children to return to me, and so I think releasing all my mental health records would not be in my best interest for the children – for the termination of parental rights not to happen. So that is my position.

The court ruled in favor of the County.

¶ 58. Susan does not argue that she was harmed or prejudiced with respect to any issue decided by the circuit court that day. Rather, Susan seemingly argues that, regardless what occurred in her absence, her right to self-representation was violated because, at the time of the hearing, she was lawfully acting as her own attorney and she had not waived her own appearance as counsel. In support, Susan cites *Klessig*, 211 Wis. 2d 194; *M.W.*, 116 Wis. 2d 432; *Spencer v. State*, 85 Wis. 2d 565, 271 N.W.2d 25 (1978); and *State v. Mills*, 107 Wis. 2d 368, 320 N.W.2d 38 (Ct. App. 1982). None of these cases, however, address the issue at hand: whether a *pro se* party is denied the right to self-representation if

a court conducts a partial motion hearing, without making a decision on the motion, in that party's absence.

¶ 59. The portion of *Klessig* Susan points to states that a waiver of counsel in a criminal case must be knowing and voluntary and that a colloquy must be conducted every time a defendant requests permission to proceed *pro se*. *Klessig*, 211 Wis. 2d at 204–07. *Klessig* might have some application here if Susan was challenging the validity of her waiver, but it says nothing about what should occur when a party, who is already properly proceeding *pro se*, fails to appear for a motion hearing.

¶ 60. *M.W.* is similarly off topic. In that case, parents facing termination of their parental rights appeared at a hearing without counsel. The issue was whether, at an initial hearing on a TPR petition, the circuit court erred by failing to ensure either that the parents were represented by counsel or had waived the right to representation. *M.W.*, 116 Wis. 2d at 438–39.

¶ 61. The other two cases Susan relies on, *Spencer* and *Mills*, address situations in which represented criminal defendants were left unrepresented at "critical" stages of their prosecutions. *See Spencer*, 85 Wis. 2d at 568, 571–72 (criminal defendant represented by counsel did not validly waive counsel's presence at the return of a verdict, a "critical stage of the proceedings"); *Mills*, 107 Wis. 2d at 369–70 (criminal defendant represented by counsel did not validly waive counsel's presence when the court read instructions to the jury, a "critical stage" of the proceedings). Susan does not address whether the proceeding conducted in her absence constituted a "critical stage," much less whether criminal "critical stage" case law has any application to

TPR proceedings or whether it matters that Susan was acting *pro se* at her own request.

¶ 62. The question, then, remains: Was Susan improperly denied her right to self-representation because the court conducted part of the proceedings we summarize above in Susan's absence? In answering this question, does it matter whether Susan's failure to appear was based on her own lack of reasonable diligence? Does it matter precisely what took place in Susan's absence and what effect, if any, such events had on Susan? These are questions Susan does not answer, and we decline to address the issue further.[9]

## II. Whether The Circuit Court Lost Competency To Proceed Because Of A Delay In Holding The Dispositional Hearing

¶ 63. Compliance with statutory time limits in parental rights termination proceedings is mandatory; a failure to comply with these time limits, absent an applicable exception, results in the circuit court losing competency to proceed. *See Sheboygan County Dep't of Soc. Servs. v. Matthew S.*, 2005 WI 84, ¶¶ 16–18, 282 Wis. 2d 150, 698 N.W.2d 631. A court does not lose competency, however, if a failure to comply with a time limit is based on a delay, continuance, or extension within the meaning of Wis. Stat. § 48.315. *Matthew S.*, 282 Wis. 2d 150, ¶ 18.

---

[9] In ¶¶ 47–51 of this opinion, we reject Susan's self-representation/due process argument that she was harmed because the circuit court heard allegations relating to her competency and relied on those allegations to rescind her right to self-representation on the second day of the fact-finding hearing.

¶ 64. The parties here dispute whether a "continuance" past a time limit was proper under Wis. Stat. § 48.315(2), which provides:

> A continuance shall be granted by the court only upon a showing of good cause in open court or during a telephone conference under s. 807.13 on the record and only for so long as is necessary, taking into account the request or consent of the district attorney or the parties and the interest of the public in the prompt disposition of cases.

When facts are undisputed, compliance with § 48.315(2) is a legal issue, subject to independent review. *State v. Quinsanna D.*, 2002 WI App 318, ¶ 37, 259 Wis. 2d 429, 655 N.W.2d 752.

¶ 65. Susan argues that the mandatory forty-five-day time limit in Wis. Stat. § 48.424(4) applicable to her dispositional hearing was exceeded without compliance with Wis. Stat. § 48.315. Before describing what Susan does and does not argue in more detail, we set forth the pertinent facts.

¶ 66. At the conclusion of the fact-finding hearing, on June 29, 2005, the circuit court addressed the parties and noted the need to hold a timely dispositional hearing. As applied here, Wis. Stat. § 48.424(4) required that a dispositional hearing commence on or before August 15, unless there was a delay, continuance, or extension authorized by Wis. Stat. § 48.315.[10] The court

---

[10] Wisconsin Stat. § 48.424(4), governing fact-finding hearings, provides:

(4) If grounds for the termination of parental rights are found by the court or jury, the court shall find the parent unfit. A finding of unfitness shall not preclude a dismissal of a petition under s. 48.427 (2). The court shall then proceed immediately to hear

314

and the guardian ad litem expressed the expectation that the dispositional hearing would be complicated because of the different situations of the two parents and because of differences between the oldest child and the other children. Thus, the court invited the parties to submit "written dispositional positions" at least a week before the hearing. Susan's attorney stated that he would be out of town from July 28 to August 9. The court asked whether anyone objected to holding the hearing after that trip, and there was no objection. The court then asked if there was any objection to holding the hearing before the trip and only the County's attorney responded, requesting that the hearing be set as quickly as possible. The circuit court stated it did not know what it had available and "would have to look." On appeal, Susan and the County agree that the only reasonable inference from the court's statement is that the court did not have its calendar before it. Following this reference to the court checking its calendar, the guardian ad litem asked the court to find "good cause" in the event the court could not schedule the dispositional hearing before Susan's attorney left town. The

evidence and motions related to the dispositions enumerated in s. 48.427. The court may delay making the disposition and set a date for a dispositional hearing no later than 45 days after the fact-finding hearing if:

(a) All parties to the proceeding agree . . . .

Here, the circuit court was authorized to delay the dispositional hearing to a date "no later than 45 days after the fact-finding hearing" because "[a]ll parties to the proceeding agree[d]" to the delay. Susan notes in her appellate brief that the forty-fifth day fell on Saturday, August 13, 2005, and she concedes for purposes of this appeal that the deadline carried over to Monday, August 15, 2005, pursuant to the general statute governing time computations, WIS. STAT. § 801.15(1)(b).

315

court responded to this request by expressly finding good cause to schedule the hearing after Susan's attorney returned from his trip "so everyone can be adequately prepared." The next reference in the record to the continuance is a "Notice of Hearing," dated July 8, 2005, setting the dispositional hearing for August 26, 2005.

¶ 67. A brief listing of issues not raised by this appeal will help clarify the arguments Susan does make.

¶ 68. Susan does not argue that the circuit court erred when it found good cause not to hold the dispositional hearing prior to August 10, the day after her counsel planned to return from a trip. As we have seen, the circuit court and the guardian ad litem both opined that the dispositional hearing would be complicated. The circuit court expressly found that there was good cause not to hold the dispositional hearing before counsel's trip so that everyone would have adequate time to prepare, and Susan does not challenge this finding.

¶ 69. Susan does not make a *Matthew S.* argument. That is, Susan does not assert that the circuit court failed to order a continuance "in open court or during a telephone conference under s. 807.13 on the record," as required by Wis. Stat. § 48.315(2). *Cf. Matthew S.*, 282 Wis. 2d 150, ¶¶ 6–7, 24; *see also State v. Robert K.*, 2005 WI 152, ¶ 32 n.26, 286 Wis. 2d 143, 706 N.W.2d 257.

¶ 70. Finally, Susan does not argue that, if the circuit court's congested calendar is a reason we may rely on for a continuance from the time her attorney returned from his trip until the dispositional hearing on August 26, the court's calendar in this case is not "good cause" within the meaning of Wis. Stat. § 48.315(2).

Rather, Susan implicitly acknowledges that the circuit court's calendar would be a good-cause reason if the record supported the circuit court's reliance on that reason.[11]

¶ 71. What Susan does argue is that the record is "inadequate and speculative as to the reasons for the delay." She contends we can only guess at the true reason the court failed to schedule the dispositional hearing sooner. Susan concedes it is possible that the circuit court's calendar was occupied for all of the dates after her counsel returned from vacation and before August 26, but she emphasizes that the record

---

[11] Susan's implicit concession that a circuit court's congested calendar is good cause for a continuance under WIS. STAT. § 48.315(2) makes sense in light of *State v. Robert K.*, 2005 WI 152, 286 Wis. 2d 143, 706 N.W.2d 257. In *Robert K.*, the supreme court held that calendaring issues contributing to a several months delay in holding a fact-finding hearing constituted "good cause." *Id.*, ¶¶ 20 n.16, 29–46, 52.

Although Susan's arguments do not require us to apply the type of "good cause" analysis used in *Robert K.*, we observe that both Susan and the County misread part of the *Robert K.* decision. Susan argues that the "four-part test" of *Robert K.* is not applicable in cases, such as this, where a circuit court explicitly finds good cause. The County seems to interpret *Robert K.* the same way. The County says that, even though the circuit court here found good cause, we ought to look to *Robert K.*'s "four part framework for analyzing good cause for continuances when none is specifically found by the [circuit] court." However, when the *Robert K.* court listed four "good cause" factors, it was not setting forth a "four-part test" (in Susan's words) or a "four part framework" (in the County's words). Rather, the *Robert K.* court simply listed four non-exclusive factors that are appropriate for both circuit courts and appellate courts to consider when evaluating good cause. *See id.*, ¶ 35 ("Although a determination of good cause *may be based on many factors,* courts have emphasized the following four factors when evaluating good cause . . . .") (emphasis added).

discloses only that the circuit court found good cause for a continuance *at a time when the court did not know whether that was true*. Thus, Susan contends, the record, as it existed at the time of the "good cause" finding, does not support a continuance beyond the forty-five-day time limit. Susan, then, makes two distinct arguments. We address and reject each.[12]

---

[12] The loss-of-competency dispute we resolve involves WIS. STAT. § 48.315(2). We do not address whether the delay was justified under § 48.315(1)(b), but we briefly comment on that subsection. Susan correctly anticipated in her appellate brief-in-chief that the County would argue that the delay was justified based on § 48.315(1)(b) because, under that statute, a "guardian ad litem" for a born child is "counsel" within the meaning of subsec. (1)(b), which excludes from the time computation "[a]ny period of delay resulting from a continuance granted at the request of or with the consent of the child and his or her counsel or of the unborn child by the unborn child's guardian ad litem," and here the children's guardian consented to the delay. Thus, Susan argues that § 48.315(1)(b) excludes delay with the consent of "counsel" for born children, but not the consent of a guardian ad litem for born children. Under the statute, Susan argues, consent to a delay by a guardian ad litem applies only to guardians of the unborn. Susan notes that the supreme court declined to address this issue in *Robert K.*, 286 Wis. 2d 143. *See id.*, ¶ 58 ("[W]e do not address the issue upon which the circuit court ruled, that is, whether a guardian ad litem's acquiescence in the circuit court's setting the fact-finding hearing beyond the 45–day period fulfills the consent requirement of WIS. STAT. § 48.315(1)(b).").

As Susan predicted, the County, in its responsive brief, argued that the "consent of the Guardian ad Litem, who is the only 'counsel' afforded a child under WIS. STATS. sec. 48.235(1)(c), is a basis for excluding time periods [in this case]." With no further discussion, the County simply cited to paragraphs 40 and 41 of *State v. Quinsanna D.*, 2002 WI App 318, 259 Wis. 2d 429, 655 N.W.2d 752. Those paragraphs, which the County cites but does not quote, contain the following language:

¶ 72. First, Susan asserts that we can only speculate that August 26, 2005, thirteen days after expiration of the forty-five-day time limit, was the first day after her attorney's trip that the circuit court had sufficient open time to hold the dispositional hearing. We disagree based on the following facts: first, counsel for the County requested that the hearing be set as quickly as possible; second, the circuit court immediately responded to this request by saying, in effect, that the court would have to check availability on its calendar; and, third, shortly thereafter, the court expressly found good cause not to hold the hearing prior to Susan's attorney's trip.

¶ 73. It is apparent from the above facts that the circuit court was telling the parties that, although the court did not have its calendar in the courtroom, it would check its calendar and set the dispositional

> Further, as the State and guardian ad litem argue, not only did the parties agree to the continuance, and not only is "good cause" apparent in the record, but, factoring-in the qualification of Wis. Stat. § 48.315(1)(b), the forty-five day limit was not even exceeded . . . .
>
> Here, the guardian ad litem for [the children] consented to the continuance for the short period beyond the forty-five day limit. Thus, under Wis. Stat. § 48.315(1)(b), the period to which [the guardian] consented would be excluded in computing the forty-five day deadline. [The parent] offers no reply to the State's and guardian ad litem's argument [and we deem unrefuted arguments admitted].

*Id.*, ¶¶ 40–41 (citations omitted). Susan does not, either in her brief-in-chief or in her reply brief, address *Quinsanna D.* Instead, she asserts that the County's response is undeveloped and that we should decline to develop an argument for it.

We conclude that the arguments of both parties on this topic are inadequately developed because neither discusses why this court is or is not bound by *Quinsanna D.*

319

hearing for the first available time after Susan's counsel returned from his trip. We acknowledge that the written notice of the hearing was dated about a week later. But this fact gives us no reason to doubt that the circuit court promptly checked its calendar for the first available time, or to speculate that the court ignored the timing issue by scheduling less pressing matters before the dispositional hearing. Although it would have been preferable for the court to check its calendar on the record with the parties present, we will not reverse based on speculation that the circuit court failed to promptly and accurately identify the earliest available time.

¶ 74. Susan's second argument is that, *based on the evidence of record,* there was not good cause at the time the court ordered the dispositional hearing continued. According to Susan, without the court's calendar before it, the court had no knowledge whether there was in fact good cause to continue the matter to August 26, past the forty-five-day time limit. Again we disagree. Susan cites *Robert K.* for the proposition that good cause supporting a continuance must be based, in Susan's words, on "the 'evidence' of record" at the time the continuance is ordered. However, the *Robert K.* paragraph Susan relies on does not speak to whether good-cause evidence must be ascertainable from the record at the time a continuance is ordered. *See Robert K.,* 286 Wis. 2d 143, ¶ 34. Moreover, we discern no reason to impose such a requirement. A hypothetical explains why. Suppose a judge states on the record that he or she will set a hearing at the first available date, the judge leaves the courtroom for a few minutes, and, upon returning, simply announces a hearing date. In this scenario, there is no evidence in the record that the date announced is in fact the first available date, but it

would be unreasonable to think otherwise. Accordingly, we reject Susan's evidence-of-record argument.

¶ 75. In sum, we conclude that the record in this case supports the continuance of the dispositional hearing to August 26.[13]

### Conclusion

¶ 76. For the reasons above, we affirm the circuit court and the final orders terminating Susan's parental rights.

*By the Court.*—Orders affirmed.

---

[13] In a one-sentence argument in her appellate brief, Susan argues that the continuance was not "only for so long as necessary," within the meaning of WIS. STAT. § 48.315(2), "[f]or essentially the same reasons" that there was no "good cause." Since we have concluded that the record supports a continuance for good cause, we likewise reject Susan's "only for so long as necessary" argument.